THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* PHILLIP BYAS *et al.*, Defendants-Appellants.

First District (4th Division)    Nos. 79-2267, 79-2303 cons.

Opinion filed February 25, 1982.

Lawrence Wolf Levin and Steven R. Decker, both of Chicago, for appellant Phillip Byas.

Daniel D. Yuhas, of State Appellate Defender's Office, of Chicago, for appellant Jesse Deloach.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr and Kevin Sweeney, Assistant State's Attorneys, of counsel), for the People.

JUSTICE ROMITI delivered the opinion of the court:
Defendants Phillip Byas and Jesse Deloach were jointly tried before a jury for the murders of Randall White and James Smith. They were convicted of both murders and sentenced to concurrent 40-year prison terms.

On appeal both defendants contend (1) they were not proven guilty beyond a reasonable doubt and (2) they were denied a fair trial when the prosecutor informed the jury defendants could not receive the death penalty. Defendants further contend that if only one of their convictions is reversed then the cause should be remanded for resentencing on the remaining conviction.

We affirm.

The pertinent evidence at trial established the following. On October 3, 1974, police discovered the bodies of the victims in the basement of an abandoned apartment building at 3743 West 19th Street in Chicago. One body's hands were tied behind its back with electrical cord. The other was concealed in a large trunk. It was stipulated that if called the pathologist who performed the autopsies on the victims would testify that Randall White had received three gunshot wounds to the head; his death was caused by massive gunshot injuries to the brain. James Smith's death resulted from a massive gunshot wound to the brain; the entry point of this wound was the middle of the forehead.

Keith Scott testified that in September 1974 he lived with Byas on the first floor of a two-story apartment building at 1140 South Independence Street in Chicago. On September 15, 1974, Scott left the apartment at about 5 p.m. Present at the time were the victims, the defendants, Shelley Edwards, and Jane Townsend. When Scott returned at 11:30 p.m. he saw

564

Edwards, Townsend, and Smith lying on the living room floor; Byas, Deloach, and Nate Sanders[1] were sleeping in Byas' bedroom. Scott went to sleep in his own bedroom.

The next morning Scott was awakened between 6 and 8 a.m. by Sanders, who had two guns in his hands, pointed down at Scott. Sanders said, "I just shot Bubba White." Scott said he thought Sanders was joking, but Sanders repeated that he had shot White. When Scott stated he did not want to become involved Sanders told him he was already involved and would have to do what Sanders asked him to do. Sanders then gave the guns to Scott, telling him to hide them. Scott placed them in a hall closet. Defendants entered the room, and Deloach stated he did not think White was dead. Defendants and Sanders then went upstairs and returned with White's body, wrapped in a quilt. They took the body to the basement and returned to the first-floor apartment, where Sanders told Scott to clean up the blood that had leaked from the quilt. Scott and Deloach spent some time cleaning up the blood.

Afterward the men all sat in the front room. Sanders told them they should "get their alibis together" and that if anyone talked they would "get the same thing." No one responded to this. Byas then stated that he was going to find out whether Smith or White was planning on "getting" Deloach. Minutes later Smith entered the house and Byas told him his girlfriend wanted him to return her phone call. Scott sat in his bedroom from where he could see Smith using the phone in Byas' bedroom. Also in Byas' bedroom were the defendants and Sanders. Deloach grabbed the phone from Smith. Byas asked Smith if he and White were planning to "get" Deloach and himself for stealing their food stamps. Smith denied any knowledge of this, but Byas said he had overheard them talking about "getting" Deloach and himself. Byas then told Smith "We just shot Bubba." When Smith expressed disbelief Deloach and Sanders took him to the basement to show him the body. They then returned with Smith to Byas' bedroom. Scott observed at this time that Deloach and Sanders each held a gun.

Smith kept pleading with Byas, telling him he had nothing to do with the alleged threat against Byas and Deloach. He also denied any knowledge of the food stamps being missing. Sanders told Smith that because he had seen the body nothing could be done to stop what was going to happen to him. Smith told them he would not go to the police and did not wish to die. Deloach told him to place his hands behind his back and then tied them with an extension cord. Smith again pleaded for his life and then asked for a cigarette. When they turned to get one Scott heard the

---

[1] Sanders was separately tried and convicted of the murders at issue. His convictions were affirmed in *People v. Sanders* (1980), 86 Ill. App. 3d 457, 407 N.E.2d 951.

sound of breaking glass. The defendants and Sanders emerged from the bedroom and Byas told Scott that Smith had jumped through the bedroom window.

Byas went out the front door and Deloach and Sanders went out through the basement. From the front porch Scott saw Byas standing on the street three houses from the apartment building. He heard someone yell "I got him." As Scott reentered the home he heard a shot and the moaning of someone in pain. He looked out and saw Deloach and Sanders holding revolvers. Sanders' weapon was smoking. Smith was leaning against the wall with a bullet hole in the center of his forehead. Sanders dragged Smith's body into the basement, followed by Deloach and Byas.

At this time Deloach's mother called. Scott answered the phone and then let Deloach out of the apartment, locking the door behind him. Byas obtained several sheets and blankets from the second floor. On Sanders' instruction Scott cleaned up the blood and glass outside the apartment and then returned to the basement. Sanders and Byas had wrapped Smith's body in the blanket.

Byas made a phone call and then he and Sanders told Scott to remain in the apartment while they got a trailer. They left in a 1972 Maverick belonging to Smith's girlfriend, Shelley Edwards. About 40 minutes later they returned to the apartment. Byas made another phone call and his brother, Eddie Byas, arrived a few minutes later. The Byas brothers went out and returned with a trunk. The trunk was taken to the basement where Scott, Phillip Byas, and Sanders placed White's body in it. Phillip Byas also placed a plastic bag over White's head. Sanders secured the blankets in which Smith was wrapped by tying a knot in them. The men went upstairs where Sanders, with a gun in his hand, stated that if anyone talked they would "get the same thing."

The two bodies were placed into a trailer attached to Shelley Edwards' car. Scott helped carry Smith's body to the trailer but did not help with the trunk bearing White. Phillip Byas, accompanied by Sanders, drove Edwards' car to a building at 19th and Ridgeway. On Byas' instruction Scott followed in his car. Eddie Byas followed behind Scott in his car. At that address Scott remained in his car but was able to see Phillip Byas and Sanders carry the trunk into the building. When Scott next saw them they pulled alongside his car, still hauling the now-empty trailer. They instructed him to wait at another location while they returned the trailer. Scott drove to that location and they rejoined him after about 40 minutes. Phillip Byas then asked Scott to follow them to a housing project at 35th and Federal. There, after Byas had wiped the door handle with a rag, they left Edwards' car in a driveway and Scott drove them back to the apartment.

Scott admitted at trial that in late October of 1974 when questioned by homicide detectives he denied any knowledge of the murders. He was arrested on November 14, 1974, and was charged with two counts of concealing a homicidal death. At that time he told police Sanders had shot and killed the victims, but he did not mention the involvement of the defendants. The next day he gave several typed signed statements in which he claimed to have first learned of the shooting on September 17 when the defendants and Sanders told him they had killed the men. Scott at that time claimed to have been asleep when the victims were killed. He had also claimed he did not awaken till noon, at which time only the defendants, not Sanders, were present. At that time he saw the containers in which the bodies were hidden but did not know of the existence of the bodies. He had denied any knowledge of the manner in which the bodies were removed from the house. Scott also admitted that in testimony before a grand jury he had failed to mention that defendant Byas was present at the house. He also did not tell the grand jury that he (Scott) had helped to wrap the bodies.

Scott testified that he did not correct these inaccuracies until after he was granted immunity. Even then he did not agree to testify (apparently in the earlier trial of Sanders) until he had been brought before a judge three times. Scott explained at trial that he lied on the prior occasions because he feared for his own life and the lives of his family.

The State also introduced into evidence statements made by the defendants on November 15, 1974. Defendant Deloach stated that the night before the shootings he had overheard White speaking to Smith and threatening to do something to Phillip Byas. White said he knew Byas had stolen his food stamps. White and Smith said they would come down and "take care" of Byas. Deloach told Byas of this, and then the two men went to bed. The next morning Nate Sanders came over. Scott was also present. Byas came downstairs and said White was accusing one of them of stealing the food stamps and was talking about killing Byas. At Deloach's suggestion he, Byas, and Sanders went upstairs to talk to White. Deloach asked White why he had accused him of taking his food stamps. White threatened to tear them to pieces with his shotgun and reached toward the place where he usually kept it. White was then shot, and Deloach turned to see Sanders holding a gun. Deloach did not see a shotgun in the room. The three men wrapped the body and placed it in the basement.

Not long after this, according to Deloach's statement, Smith came back to the apartment. Byas told Smith he had a phone call. Smith, Byas, and Sanders went into the bedroom. Deloach remained in the kitchen from where he heard a crash. Someone said Smith had gone out the window. Deloach attempted to flee. Outside the house he saw Smith being dragged back into the house. He decided to return because he

feared if he fled Sanders would think he was going to tell someone and would kill him. As Deloach entered the basement he heard a shot and saw Smith lying on the floor. Sanders had a gun in his hand. Deloach went upstairs and looked out the window to see if anyone had heard the shot. He then helped Byas and Sanders wrap Smith's body. The three men drove in Smith's girlfriend's car to rent a trailer which they used to take the body to the building at 19th Street, where they placed it in the basement. Scott, who had followed in his car, then drove them back to the apartment after they returned the trailer and left the car at a housing project. Deloach did not contact the police because he was frightened. After the statement was prepared Deloach signed it, writing that it was "right except for the part I said I carried the bodies out."

In his statement Phillip Byas recalled that both he and Deloach overheard Smith and White conversing the night before the shootings. Byas heard White threaten his life because White thought he had told the police about an unspecified matter. Smith and White then left, and Byas went to sleep.

The next morning Byas telephoned Nate Sanders and asked him to come over. Byas intended to confront White and find out why White intended to kill him. He wanted Sanders to be there with him when he did this. When Sanders arrived Byas told him about the threat. Sanders also suggested they talk to White, so Byas, Deloach and Sanders went upstairs. Byas stated that his intent was to persuade White to forget about his threats. Upstairs Byas asked White why he wanted to kill him. White first denied all, but when Byas told him of overhearing the threats he "got loud" and threatened to harm them with his shotgun. He jumped up and Sanders shot him. Byas did not actually see White with a shotgun at that time. Byas then went downstairs, informed Scott of the shooting, and took a trunk to the basement for use in disposing of the body. All four men wrapped White in a quilt and placed him in the trunk.

Within half an hour Smith came to the house. Byas told him of a telephone call and he went into the bedroom. Byas entered the bedroom, followed by Deloach, Scott, and Sanders. Byas told Smith he knew what Smith was planning. Smith pretended ignorance so Byas told him of White's death. When Smith refused to believe this Byas and the others showed him the body in the basement and then returned to the bedroom. Byas began talking to Smith, who then jumped out the window. Byas ran a block outside in pursuit but could not find him. He returned to the house and found Smith dead on the floor of the basement. Deloach, Sanders and Byas wrapped the body. Sanders and Byas obtained a trailer and the four men transported both bodies to the abandoned building. Afterward they returned the trailer and abandoned the car, which belonged to Smith's girlfriend. Keith Scott drove them back to the house. In his statement Byas

maintained that he did not know Sanders was armed when he came to the house, although he had known him to carry a gun in the past.

Both defendants testified in their own defense. In summary, they contended that, contrary to what they had admittedly told the police, they did not overhear White make any threats. Sanders was not summoned to the house, he had stayed overnight. Although they accompanied Sanders to White's room, it was Sanders who was accused by White of stealing his food stamps. They had not told Sanders of any such accusations or threats. When White suddenly moved, Sanders shot him. Then, at gunpoint, Sanders threatened them repeatedly with death if they revealed what had occurred. He ordered them, along with Scott (who was informed in the kitchen of what happened), to wrap the body and place it in the basement. Byas was instructed to get the trunk; this was not his idea as he had told the police.

When Smith came back to the house it was Sanders who grabbed him at gunpoint and told him what had happened. He was shown the body and then taken back upstairs, but his hands were not tied until after his death. When he jumped out the window Byas and Deloach ran outside, apparently considering escape. But they returned to the house when they heard a shot. In the basement they found Sanders, with a gun in his hand, standing over Smith. No one else had a gun that day. Nor was Eddie Byas ever present. On Sanders' orders Scott, Deloach and Byas wrapped Smith's body and placed White's body in the trunk.

Deloach's mother telephoned for him, and he was allowed to leave after Sanders threatened him with harm if he revealed anything. Thus, contrary to the defendants' statements to the police, Deloach did not assist in transporting the bodies to the abandoned building. This was accomplished by Scott and Byas, acting on the orders of Sanders who still had his gun, tucked into his waistband. When the Edwards vehicle was abandoned, Byas wiped off fingerprints from it on ·Sanders' orders. Sanders was let off at an intersection. Before leaving he warned Scott and Byas to "think about what happened" and told them if they tried to get away he would kill them.

Byas and Deloach both testified that the incriminating details they had given to the police were lies. Byas testified that Sanders had told him to say these things. Deloach testified that he made the statements out of fear of Sanders. Both men testified to Sanders' reputation for violence; Deloach described him as a "known killer."

## I

We first consider defendants' contention that their guilt was not established beyond a reasonable doubt. The State's theory was that defendants were accountable for the actions of Nate Sanders. We have

summarized at length the evidence adduced at trial. From that evidence the jury could have determined the following concerning the participation of the defendants. Defendants overheard Smith and White threatening Byas' life because of White's belief that Byas had stolen his food stamps. The next morning Byas summoned Sanders in order to obtain his help in confronting White. Sanders, according to the testimony of both defendants, had a reputation for violence. Deloach described him as a known killer. When Sanders arrived Deloach suggested that they all go upstairs to talk to White. There defendants confronted White with what they had heard and in the ensuing argument Sanders shot him. All three men wrapped the body in a quilt and placed it in the basement. Deloach helped Scott to remove blood stains from the floor.

When Smith returned to the house Byas told him of a phone call. Deloach grabbed the phone from him and Byas began to question him. Byas also told him "We just shot Bubba." When Smith expressed disbelief Deloach and Sanders showed him the body. They then returned him to the bedroom; at this time both Sanders and Deloach were holding guns. As Smith pleaded for his life Deloach tied him up. When he escaped both defendants ran outside with Sanders. Smith was caught and Sanders then shot him. Both defendants helped to dispose of the two bodies.

■■ We find that defendants' actions before, during, and after the shootings, as established by this evidence, were sufficient to establish their accountability. As was stated in *People v. Grice* (1980), 87 Ill. App. 3d 718, 725, 410 N.E.2d 209, 215-16, *cert. denied* (1981), 450 U.S. 1003, 68 L. Ed. 2d 207, 101 S. Ct. 1714:

> "While mere presence at the scene of the crime is insufficient to establish legal accountability for commission of the offense, one may aid or abet without actively participating in the overt act. [Citations.] Words of agreement are not necessary to demonstrate a common purpose to perpetrate a crime, since the common design can be inferred from the circumstances surrounding the commission of the unlawful act. [Citations.] Although it is true that legal accountability for a crime is based on the defendant's assistance before or during the commission of the criminal act, the defendant's conduct subsequent to the offense may raise an inference of prior or concurrent participation. [Citations.]"

The evidence we have summarized was such as to permit the jury to infer from defendants' actions that both killings were part of one common scheme which originated with the defendants when they overheard the threats made by the victims.

At trial the defendants asserted the affirmative defense of compulsion, and the jury was duly instructed on this defense. Then as now the compulsion statute provided that the defense was not applicable to "an

offense punishable with death." (Ill. Rev. Stat. 1973, ch. 38, par. 7—11(a).) But the trial court permitted this defense to be raised despite the fact defendants were charged with murder because the death penalty statute applicable to defendants (Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—1A) had been declared unconstitutional (*People ex rel. Rice v. Cunningham* (1975), 61 Ill. 2d 353, 336 N.E.2d 1), so that defendants were not charged with offenses for which they could be punished with death. Subsequently our supreme court held that the legislature had intended by its language in the compulsion statute to preclude that defense for murder generally. (*People v. Gleckler* (1980), 82 Ill. 2d 145, 411 N.E.2d 849.) The State now contends that because of that decision defendants are precluded from utilizing this defense on appeal. We do not reach the due process implications of such a claim, for we find that the State met its burden of rebutting the defense with proof beyond a reasonable doubt.

■■ The jury was not required to accept defendants' claim that they were compelled by Sanders to perform these actions. Indeed, their own admission in their statements to the police that they had summoned him to aid them in confronting the victims tends to undermine this claim. Also of significance is the absence from these statements of most of the alleged instances of threats by Sanders that defendants related in their trial testimony. Nor do we find that the threats related by Scott were such as to raise a reasonable doubt on the issue. In those statements Sanders threatened anyone who revealed what had occurred; they do not establish the facts necessary for compulsion, that the acts committed by defendants were performed under the threat of death or great bodily harm. *People v. Colone* (1978), 56 Ill. App. 3d 1018, 372 N.E.2d 871.

■■ Defendants also contend that the testimony of Keith Scott was not sufficient to establish their guilt because of the manner in which it was impeached and because as an accomplice his testimony was subject to being viewed with skepticism. (*People v. Bascomb* (1979), 74 Ill. App. 3d 392, 392 N.E.2d 1130.) The State contends that Scott was not an accomplice, citing our determination of that issue as it related to the trial of Keith Sanders. (*People v. Sanders* (1980), 86 Ill. App. 3d 457, 407 N.E.2d 951.) But even if Scott's testimony is viewed with the scrutiny accorded that of an accomplice we find that the great extent to which defendants' own statements corroborated the details of Scott's trial testimony provides a sufficient indication of reliability. The jury was aware of the extent of Scott's involvement in the occurrences at issue, and they were given an instruction on accomplice testimony. They heard his admissions concerning having lied to the police on prior occasions concerning these matters and they were informed that he had been granted immunity in return for his testimony. But they also heard the statements made by defendants in which they corroborated many of the details of the

occurrences as related by Scott. They also heard the police testimony concerning the condition of bodies when they were found, testimony which also tended to corroborate Scott. We find no basis for overturning the determination of credibility made by the jury based on all of this evidence.

## II

In final argument to the jury defense counsel, in argument concerning the credibility of Keith Scott, stated that "* * * on this man's testimony lies the lives of two young men * * *." A State objection to this was sustained. Subsequently the prosecutor in his rebuttal argument stated:

> "I think that there is one thing that we have to get straight and clear so that there is no confusion at the beginning. [Defense counsel] says that upon the testimony of Keith Scott the very lives of Mr. Byas and Mr. Deloach rests. Well, ladies and gentlemen, counsel knows that this is not a death penalty case * * *."

Defense counsel's objection was sustained and the jury was instructed to disregard the remark, but a motion for mistrial was denied. Defendants now contend that this comment was so prejudicial as to require reversal.

■■ The comment was clearly improper as it related to matters not relevant to the jury's deliberations. (*People v. Martin* (1979), 74 Ill. App. 3d 567, 393 N.E.2d 508.) However, defense counsel was not without fault in having first made a statement to the jury which may well have misled them on the issue. Moreover we find that the prompt actions of the trial court in sustaining the objection and instructing the jury to disregard the remark served to cure any error. In the context of the entire final argument we do not find that defendants, who have cited no other alleged error in those remarks, were prejudiced so as to require reversal of their convictions.

The judgment of the trial court is affirmed.

Affirmed.

JIGANTI and LINN, JJ., concur.