THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSEPH VELLA, Defendant-Appellant.

Second District   No. 84—230

Opinion filed May 7, 1985.

Louis DeLeonardis, of Bloomingdale, for appellant.

J. Michael Fitzsimmons, State's Attorney, of Wheaton (Phyllis J. Perko and Sally A. Swiss, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE SCHNAKE delivered the opinion of the court:

The defendant, Joseph Vella, was charged by indictment with committing a burglary (Ill. Rev. Stat. 1983, ch. 38, par. 19—1) of a Golden Bear restaurant in Addison and theft (Ill. Rev. Stat. 1983, ch. 38, par. 16—1(a)(1)) of more than $300 from the restaurant safe on the night of October 31, 1982, and in the early morning hours of the next day. Following a bench trial, he was found guilty as charged. The defendant was subsequently sentenced to two concurrent 36-

month terms of probation, each conditioned on his serving concurrent six-month terms of periodic imprisonment (work release). He was also fined $1,000 on the burglary conviction. The defendant appeals, contending (1) that his pretrial motion to suppress statements was erroneously denied; (2) that he was not proved guilty beyond a reasonable doubt; (3) that the trial court improperly restricted his cross-examination of one of the witnesses for the State; and (4) that the trial court improperly admitted certain evidence regarding "the conduct of a third party *** as evidence of the [d]efendant's guilt."

Prior to the indictment and arrest of the defendant on May 4, 1983, the police investigating the burglary of the Golden Bear restaurant persuaded one of the defendant's friends, Diane Mason, to engage him in conversations about the offense, and to permit the police to tape-record those conversations. These conversations were the subject of the defendant's written pretrial motion to suppress statements. That motion had both a constitutional and statutory basis. The defendant maintained that his constitutional rights were violated because, at the time the police recruited Mason to elicit statements from him, they had already been informed that the defendant had retained counsel to represent him in connection with the investigation of the burglary, and that he did not wish to give the police any statements. The defendant's statutory argument was that the statements were inadmissible under section 108A—4 of the Code of Criminal Procedure of 1963, as amended (Ill. Rev. Stat. 1983, ch. 38, par. 108A—4), because Mason's consent to the use of the tape recorders was invalid, having been coerced by the police.

Evidence at the hearing on the motion to suppress revealed that on December 31, 1982, the defendant, who was then a suspect, retained attorney Robert Anderson to represent him in connection with the investigation of the burglary. Anderson advised him not to speak with the police. About a week later, Anderson told Detective Thomas Gorniak of the Addison police department that the defendant did not wish to make any statements to the police.

On January 25, 1983, Gorniak went to Mason's place of employment, a Martin Oil gas station, and asked her if she knew whether the defendant was involved in the burglary. She replied that she did not know whether he had done anything.

Gorniak subsequently telephoned Mason and asked her to come to the police station so that he could ask her some more questions. Mason agreed to do so and went to the police station on February 3, 1983. Gorniak again asked her if she knew anything about the offense, and Mason replied that she still did not. At the hearing on the

motion to suppress, Mason was asked, "Did [Gorniak] make any statements to you about what would happen to you if you would not speak with him?" She replied, "Oh, well, he says, you know, if I don't tell the truth, that I would be in contempt of court; that I would have to go before a jury and try and prove I wasn't lying to him, that I didn't know anything." Gorniak then asked Mason if she would take a voice stress test, and she said she would.

The test was administered by Detective Donald Imbordino and lasted about 25 minutes. After the test was completed, Gorniak informed Mason that she had failed. Mason testified that Gorniak told her that if she would not tell him what she knew, he would cause a subpoena to be issued for her to appear before the grand jury. She said that Gorniak told her "that it would be crazy for me to sit here and still lie because he had a subpoena all waiting. And I would have to go before a grand jury and try to prove if I wasn't lying. And if I was, then I'd have to go to jail for a year." Mason testified that, based on Gorniak's threats that she could go to jail for lying, she then told Gorniak what the defendant had related to her about his involvement in the burglary and continued to cooperate with the police. Mason testified that she was upset and crying during her conversation with Gorniak.

On the other hand, Mason also testified that Gorniak did not threaten her with jail if she refused to consent to the tape-recording of her future conversations with the defendant. The threats of jail were directed at her lying. Mason's testimony in this regard was impeached with a prior written statement she had made that "[t]he only reason [she] agreed [to the use of the eavesdropping device] was because [she] was threatened to go to jail." Mason testified that the prior written statement was incorrect, and that an investigator for the defense had essentially dictated that statement for her to write and sign after the two had a conversation about the case. Mason also stated that she was at work during her meeting with the investigator and that the gas station was very busy. She said that she did not read the statement after she wrote it, although the statement itself says that she did.

In any event, on February 3, 1983, after her conversation with Gorniak, Mason signed a written consent to the use of an eavesdropping device. On the same date, she called the defendant's home on a telephone to which an eavesdropping device had been attached, but the defendant was not home, and she spoke with his roommate, Claudio Baraglia.

Three weeks later on February 23, 1983, Mason signed a second

consent to the use of an eavesdropping device. Mason testified that at that time she was no longer concerned that she might go to jail if she did not continue to cooperate with the police. Later that evening she met the defendant and Baraglia at the Addison House restaurant. Pursuant to instructions from the police, Mason tried to elicit incriminating statements from the defendant regarding the burglary. The conversation was recorded on a tape recorder the police provided which was concealed in Mason's purse.

On February 25, 1983, she signed another consent to the use of an eavesdropping device. The police attached the device to the telephone at the gas station where Mason was working, and, when the defendant called her there, the police recorded the conversation. Based on the evidence recounted above, the trial court denied the defendant's motion to suppress.

At the ensuing bench trial Mason testified for the State. She said that sometime in November of 1982 the defendant told her that he committed the burglary and theft. According to Mason, the defendant told her that he was at the Golden Bear restaurant on Halloween night. Just prior to closing time he went into the bathroom and climbed up above the ceiling. He remained there until the restaurant was closed, and everyone was gone. He then crawled along the rafters from the bathroom to a point above the office area and then dropped down into the office and opened the safe. The defendant then took the money and left through "the emergency exit." Baraglia was outside waiting for him with a car, and the two men left. Mason testified that the defendant told her that one of the waitresses gave him the combination to the safe. The defendant then asked her to give him an alibi to the effect that she had met him at the Golden Bear, and that from there they went to a movie, and then to a different Golden Bear restaurant for coffee. Mason agreed to provide the alibi, although she had not really been with the defendant that night. According to Mason, the defendant also asked her to hold the money for him because he was afraid the police would search his home. Mason agreed to do so, and the defendant gave her a small package about the size of a dollar bill. Mason testified that she hid the package in a closet in her apartment, and that about a week later the defendant came to her apartment and retrieved it.

Mason also testified about her conversation with the defendant and Baraglia at the Addison House restaurant. She said the defendant told her not to worry, that the police could not prove anything, and that Mason would not go to jail. Mason stated that she subsequently listened to the tape recording of that conversation, but that

she could not really make out any of the speech because the background music at the restaurant had been too loud.

She also testified about her telephone conversation with the defendant on February 25, 1983. The tape recording of that conversation was played in open court. In that conversation Mason told the defendant that she was afraid she would be subpoenaed to appear before the grand jury. The defendant told her to stick with the story that on the night in question they went to a movie, and then to a Denny's restaurant. The defendant told her that the police could not prove he committed the burglary, and that they were trying to scare her and his other friends into saying that he confessed to them. The defendant said:

"I mean here, I go and call Jackie and all of a sudden they [the police] are taking her down for questioning because I talked to her. And all of a sudden I call again and I find out that they called her a second time—they want her to come down [to the police station] again. And the same with Carol. They are taking a shot at you, Carol and Jackie. And the only difference is you know and they don't. That's the only difference. And all you got to do is deny it. Stick with the story you told and leave it at that."

At another point in the conversation the defendant, to show Mason how the police had been lying about what they knew about the burglary, told that when he was questioned, they told him that he had asked a waitress for the combination to the safe. The defendant said:

"That's not true. Now, see, there is proof right there. They [also] told you that I asked a waitress for—for a combination. I—I proved to you—there is no reason to lie to you, Diane, there is no reason. That was a lie right there. There is one lie right there that you just caught them in and they are telling you and they have got you convinced that I asked for it and Cindy [Giannini] gave it to me. I never even asked for it. I didn't even want to—I had no intentions of going back there. She said here, help me, I can't do it. Here's the combination."

At another point in the conversation Mason asked the defendant what would happen to her if the police found out she "held the money" for him. The defendant replied, "You don't say nothing. They can't prove nothing. If they could prove it, Diane, I'd be—I'd be put away." The defendant concluded the conversation by saying that he was going to deny his participation in the burglary "all the way *** [b]ecause they don't have the proof and that's why I am denying it."

On cross-examination Mason admitted that on January 25, 1983, she told the police that she did not know anything about the burglary.

Through the testimony of the night manager of the restaurant on the night in question, George Super, and the unit manager, John Wehr, the State established that on the morning of November 1, 1982, more than $300 that had been in the safe the night before was missing. It was common knowledge among employees at the restaurant that one could enter the office by climbing over a wall between the office and the kitchen. In order to do so, one would have to move a ceiling tile in the kitchen, climb through the hole, move a ceiling tile over the office, and drop down through that hole. The defendant had been the unit manager of the restaurant until about a year prior to the burglary. The combination to the safe had been changed since he left. Super testified that on the day the money was missing, he noticed that a portion of one of the ceiling tiles in the men's bathroom was broken so that "someone could get up there." Super stated, however, that for all he knew, the tile could have been broken up to six months earlier. Finally, Super gave his opinion that it would be impossible to climb over the ceiling all the way from the bathroom to the office because those rooms were on opposite ends of the restaurant, about 50 feet apart, and other than beams and conduit, the only support would be from the ceiling tiles themselves. There was no floor.

Officer Gorniak testified that in February of 1983 he went to the restaurant. He went to the men's bathroom, found some loose ceiling tiles above the toilet, and crawled up above the ceiling. He stated that the distance between the ceiling and the roof was about four feet. That distance was the same over all areas of the restaurant. Gorniak also testified regarding the chain of custody of the tape recording of Mason's telephone conversation with the defendant on February 25, 1983.

Todd Exler also testified for the State that on the night in question he was at the Golden Bear restaurant. He was sitting at a table with Super, the defendant, and Baraglia. Exler left the restaurant sometime after the 11 p.m. closing time. Baraglia left when Exler did, and Super left shortly thereafter. When Exler left the restaurant, he did not see the defendant there. Exler said he could not remember when he last saw the defendant in the restaurant. From the Golden Bear, Exler went to John's Pizza, where he met Super and Baraglia. John's Pizza was located about three-quarters of a mile away from the Golden Bear. Over the defendant's objection based on

relevance, Exler was allowed to testify that Baraglia did not arrive at John's Pizza until about 20 minutes after he did.

Cindy Giannini also testified for the State. She was a waitress and relief manager for the Golden Bear restaurant. On October 28, 1982, she was working as the night manager. Her duties included counting the money in the safe prior to closing. She knew the combination to the safe. On that date the defendant was dining at the restaurant with Baraglia. The defendant asked Giannini if he could speak with her in the office. He asked her if the combination had been changed since he was unit manager, and she told him that it had. Giannini testified that she pretended she was having a difficult time opening the safe, and that she told the defendant there was something wrong with it, and she could not get it open. Giannini testified that she did not give the defendant the combination.

For the defense several witnesses testified that the defendant had a good reputation for honesty.

In addition, the defendant's mother testified that her son was unemployed from August of 1982 through December of that year. She lent the defendant money during that period of time. In October she lent him $1,000, in November $500, and in December $500. Mrs. Vella made these loans with cash she kept in her house in case of emergency.

Finally, the defendant testified on his own behalf. He denied committing the burglary. He stated that on the night in question he went to the restaurant with Baraglia and sat down at a table. Later on, Super and Exler joined them. Baraglia suggested that they go to John's Pizza for drinks after the Golden Bear closed. The defendant declined, saying that he had already arranged to go out for a drink with Mason. The defendant testified that he did not really have other plans, but that he did not want to go out with Exler because Exler was jealous of the defendant's relationship with one of the waitresses. The defendant testified that he left the Golden Bear at about 10:30 p.m. and went home.

The following day he went to see Mason at the gas station where she worked. While he was talking with her, Exler arrived. The defendant then told Mason what happened the night before so that they could get their stories straight.

The defendant testified that his roommate, Baraglia, told him that he (Baraglia) had been questioned about the offense by security personnel and the police. Baraglia told the defendant that when he was questioned, he was told that the perpetrator hid above the ceiling in the bathroom until the restaurant closed, and then crawled

across the ceiling to the office. About two weeks after the offense, Baraglia told the defendant that he (Baraglia) had been told that their house was being watched by the police. The defendant testified that he was afraid the police would search his house and find the money his mother lent him and erroneously conclude that he was involved. He took the money, therefore, to Mason and asked her to hold it for him. The defendant testified that he did not tell Mason he committed the offense, but rather that he had heard that either he or Baraglia supposedly hid up above the bathroom ceiling until after closing, and then crawled across the ceiling to the office, and stole the money. The defendant testified that he retrieved his money from Mason about a week later because he realized he had overreacted.

The defendant then testified that Mason told him she was visited by Addison police officers who said they had been told that she and the defendant went out for a drink on the night in question. Mason told the defendant that she was nervous because she had not been with him. The defendant asked her to stick with that story because a change would create suspicion.

The defendant testified that on October 28, 1983, he was at the Golden Bear. Giannini approached him and complained that she was having problems with the safe. The defendant suggested that maybe Wehr had changed the combination and not told her about it. The defendant testified that Giannini asked him if he would open the safe for her, but he refused. He did go into the office with Giannini because he wanted to see his termination sheet which set forth the reason he was fired by Golden Bear. He was having difficulty obtaining a new position with a restaurant. Giannini looked for the paper but could not find it. While he was in the office, Giannini was working on the safe, but at that time the defendant had his back to her because he was talking with another waitress named Karen.

Based on the evidence recounted above, the court found the defendant guilty as charged, and he was subsequently sentenced as indicated above.

■ We first consider the defendant's argument that his pretrial motion to suppress statements was erroneously denied. The defendant maintains that his right to counsel under the sixth amendment (U.S. Const., amend. VI) was violated when the police, knowing that he had retained counsel with respect to the investigation and did not wish to give the police any further statements, used Diane Mason to elicit incriminating statements from him. The defendant also maintains that such conduct by the police violated his right to due process of law.

With respect to his sixth amendment claim, the defendant relies on *Massiah v. United States* (1964), 377 U.S. 201, 12 L. Ed. 2d 246, 84 S. Ct. 1199, and *United States v. Henry* (1980), 447 U.S. 264, 65 L. Ed. 2d 115, 100 S. Ct. 2183. In each of those cases the United States Supreme Court held that the sixth amendment prohibited the introduction at trial of statements deliberately elicited from the defendant by a police informant after indictment of the defendant, and in the absence of his counsel, or a waiver of his right to counsel. Those cases are distinguishable, however, because in the instant case the defendant had not been indicted or arrested when Mason elicited the incriminating statements from him. In *United States v. Gouveia* (1984), 467 U.S. 180, 81 L. Ed. 2d 146, 104 S. Ct. 2292, the court held that the right to counsel under the sixth amendment does not attach until the initiation of judicial proceedings, whether by way of formal charge, preliminary hearing or arraignment. (See also *Kirby v. Illinois* (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877, and *People v. Martin* (1984), 102 Ill. 2d 412, 466 N.E.2d 228, *cert. denied* (1984), 469 U.S. 935, 83 L. Ed. 2d 270, 105 S. Ct. 334.) In the instant case, since the defendant's sixth amendment right to counsel had not attached at the time Mason elicited the statements from him, the exclusionary rule of *Massiah* and *Henry* is inapplicable. The defendant cites *Escobedo v. Illinois* (1964), 378 U.S. 478, 12 L. Ed. 2d 977, 84 S. Ct. 1758, for the proposition that the sixth amendment right to counsel may attach prior to the initiation of judicial proceedings. While the language of the court's opinion in *Escobedo* seems to support this contention, in *Gouveia* the court stated that "we required counsel in *** Escobedo in order to protect the Fifth Amendment privilege against self incrimination rather than to vindicate the Sixth Amendment right to counsel." *United States v. Gouveia* (1984), 467 U.S. 180, 188 n.5, 81 L. Ed. 2d 146, 154 n.5, 104 S. Ct. 2292, 2298 n.5.

We recognize that, although judicial proceedings against the defendant had not been initiated when Mason elicited his incriminating statements, he had already retained an attorney to represent him in connection with the investigation of the burglary, and the police were aware that he had done so. The source of the defendant's challenge to the admission of his own statements into evidence is, however, the sixth amendment exclusionary rule, and the United States Supreme Court has clearly held that the initiation of judicial proceedings is the controlling consideration. The fact that he had retained counsel and that the police knew he had done so is not relevant to the sixth amendment question. *United States v. Mitlo* (3d Cir. 1983),

714 F.2d 294, *cert. denied* (1983), 464 U.S. 1018, 78 L. Ed. 2d 724, 104 S. Ct. 550. See also *People v. Martin* (1984), 102 Ill. 2d 412, 466 N.E.2d 228, *cert. denied* (1984), 469 U.S. 935, 83 L. Ed. 2d 270, 105 S. Ct. 334 (sixth amendment not violated by admission into evidence of statements elicited from the defendant by the police prior to initiation of judicial proceedings, even though counsel had been appointed to represent the defendant in connection with an unrelated criminal charge).

■ The defendant also contends that the conduct of the police here violated his right to due process of law. In support of this contention he cites *Rochin v. California* (1952), 342 U.S. 165, 173, 96 L. Ed. 183, 190, 72 S. Ct. 205, 210, where the court stated that under the due process clause of the fourteenth amendment (U.S. Const., amend. XIV) "convictions cannot be brought about by methods that offend 'a sense of justice.' " The facts of *Rochin* are nothing like the facts in this case. In *Rochin* the police illegally entered the defendants room, saw him swallow two capsules, struggled to open his mouth and retrieve them, and then took him to a hospital where, against his will, an emetic solution was forced through a tube into his stomach. The stomach pumping caused Rochin to vomit, and the two capsules were recovered from the vomited matter. Because these facts are so far removed from the instant case, *Rochin* gives little guidance on the question of the application of the due process clause to the police conduct here.

A much more similar case was *Hoffa v. United States* (1966), 385 U.S. 293, 17 L. Ed. 2d 374, 87 S. Ct. 408. In that case a compensated government informant had conversations with the defendant, James Hoffa, and overheard other conversations in which Hoffa took part, where he made statements concerning his attempts to bribe jurors in a pending criminal proceeding known as the Test Fleet trial. Hoffa was a defendant in that trial and was represented by counsel in that proceeding. The incriminating statements the informant heard were not made in the presence of counsel. The informant was allowed to testify to Hoffa's statements, and the latter was convicted of endeavoring to bribe two jurors. In his appeal to the Supreme Court, Hoffa, citing *Rochin*, maintained that his right to due process of law was violated because the conduct of the government "offend[ed] those canons of decency and fairness which express the notions of justice of English-speaking peoples." (*Hoffa v. United States* (1966), 385 U.S. 293, 310-11, 17 L. Ed. 2d 374, 387, 87 S. Ct. 408, 418.) The Court disagreed, stating that the use of informants had been countenanced from time immemorial.

We can perceive no valid distinction between *Hoffa* and the instant case insofar as due process of law is concerned. Here, as in *Hoffa*, the police merely enlisted the aid of an informant to obtain incriminating statements from the defendant which they knew he would not otherwise make to them. Such conduct is not in conflict with due process of law. See also *United States v. Mitlo* (3d Cir. 1983), 714 F.2d 294, *cert. denied* (1983), 464 U.S. 1018, 78 L. Ed. 2d 724, 104 S. Ct. 550.

█ The defendant also maintains that his statements should have been suppressed under section 108A—4 of the Code of Criminal Procedure of 1963 because, he maintains, Mason's consent to the use of an eavesdropping device was improperly coerced by inducements and threats on the part of the police. Section 108A—4 sets forth the requirements for judicial authorization of the use of such a device, including that "one party to the conversation has or will have consented to the use of the device." (Ill. Rev. Stat. 1983, ch. 38, par. 108A—4(a).) It has been held that this provision does not require an informed consent, but rather it is sufficient if the party knows the device is being used and proceeds without objection. (*People v. Fredrics* (1979), 76 Ill. App. 3d 1043, 395 N.E.2d 723.) We are aware of no Illinois cases, however, which construe the consent requirement of section 108A—4 involving inducements or threats made by the police to the party whose consent is sought.

The parties have suggested that we follow the Federal cases which have construed in that context a similar Federal statute (18 U.S.C.A. sec. 2511 (1970)). In our view, however, it is not necessary to decide whether the principles of those cases are applicable to the Illinois statute involved here, because we believe that the trial court properly concluded that the threats or inducements Officer Gorniak made or offered to Mason were not directed at obtaining her consent to the use of the eavesdropping device. Mason explicitly testified that Officer Gorniak's comments to her about going to jail for contempt or perjury were directed at her continued lying, and not at her consent to the use of the eavesdropping device. Mason could have told Officer Gorniak what she knew about the offense, and then refused to consent to the electronic eavesdropping without any concern about Gorniak's references to jail. In fact, Mason did testify that at the time she consented to the tape-recording of her meeting with the defendant and Baraglia at the Addison House restaurant, she was no longer concerned that she might go to jail if she did not continue to cooperate with the police. According to Mason's testimony, then, there is no indication that her consent to the electronic eavesdrop-

ping on that occasion and thereafter was anything but voluntary. Moreover, the only statements of the defendant introduced at trial were made after Mason's consent to the tape-recording of the Addison House meeting. It is true that Mason's testimony in this regard was impeached with a prior inconsistent statement she made to a defense investigator. Mason gave her explanation for that inconsistent statement, however, and her credibility was a matter for the consideration of the trial judge. Findings of fact of the trial judge on motions to suppress should not be reversed unless they are clearly unreasonable. (*People v. Clark* (1982), 92 Ill. 2d 96, 440 N.E.2d 869; *People v. Haskell* (1968), 41 Ill. 2d 25, 241 N.E.2d 430, *overruled on other grounds by People v. Nunn* (1973), 55 Ill. 2d 344, 304 N.E.2d 81.) We cannot conclude that it was clearly unreasonable for the trial court to credit Mason's testimony to the effect that her consent was not coerced.

■ We next consider the defendant's contention that he was not proved guilty beyond a reasonable doubt. The defendant first maintains that the evidence against him was entirely circumstantial. It was not. Mason testified that the defendant admitted to her that he committed the offenses, and such an admission constitutes direct evidence. (*People v. Panus* (1979), 76 Ill. 2d 263, 391 N.E.2d 376.) The remainder of the defendant's argument in this regard is essentially an attack on the credibility of Mason's testimony. We are not persuaded by the defendant's efforts in this regard. Mason's testimony was convincingly corroborated by the defendant's own statements in the tape-recorded telephone conversation. (See *People v. Byas* (1982), 104 Ill. App. 3d 562, 432 N.E.2d 1226.) The defendant told Mason that the police were trying to scare her and his other friends into saying that he had confessed to them. He then said that the only difference between Mason and two of his other friends was that "you [Mason] know and they don't." In the conversation the defendant admitted that Giannini offered him the combination to the safe. He said that if the police could prove that Mason held the money for him, he would "be put away." Finally, the defendant told Mason he was going to deny his participation in the burglary "all the way *** [b]ecause they [the police] don't have the proof."

Furthermore, Mason's testimony concerning the defendant's confession was corroborated by the evidence of the loose tile in the bathroom, and, as discussed below, by the fact that Baraglia did not arrive at John's Pizza for drinks until 20 minutes after Exler. Although Mason's testimony was impeached, and there were minor inconsistencies in the State's evidence, these matters were for the consideration

of the trier of fact. The evidence is not so improbable as to suggest a reasonable doubt of guilt. See *People v. Sangster* (1982), 91 Ill. 2d 260, 437 N.E.2d 625.

■■ We next consider the defendant's contention that the trial court improperly restricted his cross-examination of one of the State's witnesses. During cross-examination of Officer Gorniak, the defendant sought to question him about pending internal disciplinary charges brought against him by the Addison police department. The court barred this inquiry, and, in an offer of proof, defense counsel stated that Gorniak was charged in those proceedings with shooting a firearm loaded with blanks at a civilian as a joke. The defendant maintains that the cross-examination he was not allowed to undertake was relevant on the question of the witness' bias and credibility. See *People v. Mason* (1963), 28 Ill. 2d 396, 192 N.E.2d 835.

In our view we do not have to decide this interesting question because any error in this regard would be harmless beyond a reasonable doubt. (See *People v. Reyes* (1981), 102 Ill. App. 3d 820, 429 N.E.2d 1277.) The crucial evidence in this case was Mason's testimony regarding the defendant's confession and the defendant's own tape-recorded statements, which convincingly corroborated Mason. All Gorniak testified about were his observations of the area above the loose ceiling tile in the bathroom, which could have been easily refuted by the defense if they were not true, and the chain of custody of the tape recording. His credibility with respect to the chain of custody was not really a significant question since there was absolutely no indication of tampering. Under these circumstances, any improper restriction in the cross-examination of Officer Gorniak would be harmless error.

At oral argument in this court the defendant maintained that this alleged error could not be harmless because Gorniak's credibility was of major importance at the hearing on the motion to suppress. This argument overlooks the fact that the allegedly improper restriction of cross-examination occurred at the trial, not at the pretrial hearing on the motion to suppress. In fact, there is no indication in the record that the internal disciplinary charges were pending against Gorniak at the time of the pretrial hearing. The importance of Gorniak's testimony at that hearing, therefore, is irrelevant to the question of harmless error.

■■ ■ The defendant's final argument is that the trial court erred by admitting certain evidence regarding "the conduct of a third party *** as evidence of the [d]efendant's guilt." More specifically, he contends that the evidence that Baraglia arrived at John's

Pizza 20 minutes after Exler did was irrelevant on the question of the defendant's guilt. Evidence is relevant when it tends to prove a disputed fact, or to render the matter in issue more or less probable in light of logic, experience, and accepted assumptions of human behavior. (*People v. Gardner* (1977), 47 Ill. App. 3d 529, 362 N.E.2d 14.) The determination of the relevance of proffered evidence is addressed to the sound discretion of the trial court, and its decision will be reversed only in the case of an abuse of discretion. (*People v. Gardner* (1977), 47 Ill. App. 3d 529, 362 N.E.2d 14.) In the instant case Mason testified that when the defendant confessed to her that he committed the offenses, he told her that when he left the restaurant with the money, Baraglia was waiting for him with a car. Exler's testimony that, although Baraglia left the restaurant at the same time he did, Baraglia did not arrive at John's Pizza until 20 minutes after he (Exler) did, tends to corroborate Mason's testimony regarding the defendant's confession, and it was, therefore, properly admitted. This case is not one such as *People v. Newbury* (1972), 53 Ill. 2d 228, 290 N.E.2d 592, where the relevance of the evidence depends upon unproved assumptions. Here the State proved the assumption that Baraglia's tardiness was caused by his participation in the crimes with the defendant by Mason's testimony regarding the defendant's confession.

■ Although the defendant has not raised the point, his sentence to probation for a term of 36 months on the conviction of theft exceeds the statutory maximum. Theft over $300 is a Class 3 felony. (Ill. Rev. Stat. 1983, ch. 38, par. 16—1(e)(3).) The maximum term of probation for such an offense is 30 months. (Ill. Rev. Stat. 1983, ch. 38, par. 1005—6—2.) Accordingly, we reduce the term of probation on the theft conviction to only 30 months.

For the reasons stated above, with the exception of our modification of the sentence for theft, the judgment of the circuit court of Du Page County is affirmed.

Affirmed as modified.

LINDBERG and STROUSE, JJ., concur.