THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. THOMAS WHITE, Defendant-Appellant.

Second District No. 84—0059

Opinion filed June 12, 1985.—Rehearing denied July 15, 1985.

G. Joseph Weller, Paul J. Glaser, and Jan K. Dargel, all of State Appellate Defender's Office, of Elgin, for appellant.

Robert J. Morrow, State's Attorney, of Geneva (Phyllis J. Perko and Martin P. Moltz, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

The defendant, Thomas White, was convicted by a jury on indictments in the circuit court of Kane County for home invasion and residential burglary. (Ill. Rev. Stat. 1983, ch. 38, pars. 12—11(2), 19—3(a).) He was sentenced to the Illinois Department of Corrections for concurrent extended terms of 40 years for home invasion and 30 years for residential burglary.

At trial, Officer Schmidt of the Elgin police department testified that he responded to a call to go to a residence at 411 Prospect Street in Elgin on July 9, 1983. There he found Gertrude Waite and her son, Howard Waite. The left side of Mrs. Waite's face was swollen and bruised. She seemed confused and could not remember what had happened, but was alert. Schmidt found no blood and no sign of a struggle or of a forced entry. He said that after Mrs. Waite was taken to the hospital, she was checked for possible sexual assault but that it was not determined "at that time" that there was such an assault. The defendant moved for a mistrial on the grounds the defendant was unduly prejudiced by Schmidt's reference to a sexual assault when, as admitted by the prosecutor in chambers, there was no evidence Mrs. Waite had been sexually assaulted. The defendant's motion was denied.

Several Elgin police officers testified to a search of the area surrounding the Waite apartment. Officer Darr found Mrs. Waite's wallet

in the street in front of an adjacent vacant lot; Officer Christ found a purse and glasses and other identification belonging to Mrs. Waite in some bushes on the vacant lot and some miscellaneous papers on the lawn of the house on the corner; Officer Bjorklund took latent fingerprint lifts from Mrs. Waite's sunglasses, from the TV stand inside the Waite apartment, and from a dresser.

One of the officers assigned to investigate the case, Detective Landwehr, testified that he had information the day following the incident that two black males and one white female were involved. He then received further information from an anonymous telephone caller. Over a defense objection, Landwehr was allowed to testify to the content of the call; namely, that Lujuana McCain, Thomas White, and a person known to the caller by the possible alias of Tompy Douglas were the perpetrators.

Based on information subsequently obtained from McCain, Landwehr and three other officers executed a search warrant for a house occupied by a woman named Jerrie Bullard and her children on Hickory Street. The officers found a black and white RCA portable television and mail belonging to the defendant in a first floor bedroom, and a VISA credit card belonging to Gertrude Waite between the sofa cushions in a central first floor room.

Landwehr testified that he performed a fingerprint analysis, comparing the items seized from the Bullard house and the prints lifted previously by Officer Bjorklund to prints of McCain and the defendant. The defendant moved for a mistrial when Officer Landwehr testified "[they] had another" fingerprint card of the defendant to use for comparison purposes than the one identified at trial as the "State of Illinois fingerprint card which was taken at the time of Mr. White's arrest by Detective Bricktson [sic] on the 11th." The motion was denied.

Landwehr testified he was told that other people lived in the Bullard house, and that to his knowledge, Lujuana McCain lived there. He did not know who slept in the bedroom in which the TV was found.

Elgin detective James Lamkin, in charge of the investigation of the offense, testified that he received a telephone call from a confidential informer, described as a person familiar with the community and people in it. Over defense objection, Lamkin was allowed to testify that the caller stated that he had seen the defendant with Lujuana McCain and another black male the previous night, the night of the Waite burglary. Over another defense objection, Lamkin testified the officers who initially investigated the offense had spoken with

someone who had seen a white female and two black males in the lot adjacent to the Waite residence on July 9.

Lamkin testified he spoke with the defendant, upon the defendant's request, in the Kane County jail on July 14. After the defendant queried Lamkin about the events leading to his arrest, the defendant denied any involvement in the incident, but then told Lamkin that he "had returned to the area where this incident occurred and he had picked up the purse[,] looking through it." On cross-examination, Lamkin testified the defendant did not admit to being in the Waite apartment and striking Gertrude Waite.

Joseph Ambrozich, a forensic scientist and latent print examiner with the Illinois Department of Law Enforcement, testified he compared the latent prints lifted by Officer Bjorklund with the defendant's and Darryl Daniels' (a/k/a Tommy Douglas) fingerprint cards. The only match was of the defendant's right middle fingerprint which was found on Mrs. Waite's sunglasses.

Howard Waite, the victim's son, testified he returned home about midnight and found his mother sitting in the dark. He noticed a TV set was missing from the living room and that his mother had a swollen jaw. Another TV set in an adjacent bedroom was also missing. He testified his mother was very incoherent, but "she mentioned they took her purse" and that 'she said they hit me when I tried to stop them from taking my purse." On cross-examination, Waite recalled telling Officer Schmidt that his mother could not really remember what happened to her when she was attacked.

An emergency room nurse at Sherman Hospital in Elgin, Karen Gartner, testified Mrs. Waite had a large bruise on her lower left jaw. Her vital signs were stable. She seemed a little drowsy and not too clear about the events of the prior several hours. Gartner testified without objection that she assisted the doctor in taking evidence for the rape kit, which was given to an Elgin police department detective. Over defendant's "leading" objection, Gartner was allowed to testify that Mrs. Waite's injury was consistent with one caused by being punched on the jaw. On cross-examination, Gartner acknowledged there are other ways to fracture a jaw besides being punched, and that she had no personal knowledge either that Mrs. Waite had been punched or assaulted. She stated Mrs. Waite's physical examination revealed that she was alert and oriented. With reference to the rape kit, Gartner stated there was no evidence Mrs. Waite had been raped.

Doctor Viswanatham Susarla attended Mrs. Waite in the hospital after she was brought to the floor from the emergency room. Doctor Susarla confirmed the victim had a broken jaw, but was alert and

well-oriented, and not in shock, although she did have some high blood pressure and some abnormality in her electrocardiogram. The doctor testified Mrs. Waite told her she had a robbery and that "she was punched on her left side and that's how she got the injury over the left jaw and upper part of the neck."

Mrs. Gertrude Waite testified she remembered being in the hospital after the incident, and that she had her 75th birthday while she was there. She said she now has extreme difficulty in remembering things. She identified her purse and its contents which included her sunglasses, and her VISA card. She testified she "had no recollection of who they were or what they did."

Lujuana McCain testified for the State. She admitted she had a prior cannabis conviction and two felony theft convictions. She said she walked to a friend's home with the defendant and Darryl Daniels about 10 p.m. on July 9. She went inside alone, and when she came back out about 15 minutes later, she saw Daniels standing down the street. She later denied on cross-examination having made a contrary statement to the police that she saw both Daniels and the defendant standing down the street.

McCain testified she walked down to where Daniels was, and they waited for the defendant for about five minutes. They began to leave, but the defendant called to Daniels, and they went back to where the defendant was standing in front of the driveway of a big white house that had a back porch light on. The defendant was holding a Singer color TV. He told Daniels he had knocked out an old lady in the house, and that he wanted Daniels to help him get another TV and stereo from the house. Daniels did not go back in the house with the defendant, but he hid the TV in some bushes by the vacant lot next to the house, and then he and McCain stood by the bushes. About five minutes later, the defendant came back out of the house carrying a second TV and a purse.

He put the TV in the bushes next to the other one, and emptied everything out of the purse, taking a blue checkbook. They then walked away down Prospect and continued on down to Fremont Street in Elgin. The defendant flagged down someone named Jimmy passing in a car, and the two had a conversation. Jimmy told two friends who were riding in his car to get out of the car, the defendant and Daniels got in the car, and the three of them left. McCain and Jimmy's two friends then walked to Jerrie Bullard's house on Hickory. McCain denied she lived there, and testified Jerrie and Jerrie's kids lived there.

The defendant and Daniels arrived about 10-15 minutes later, car-

rying the two TV's. They verified the TV's were in working order by plugging them in, and the defendant and Daniels left again to see if they could sell the TV's. They returned with the TV's about one hour later. The defendant left again, alone this time, and returned with Tompy Spates, who agreed to buy the color TV from the defendant for $50. McCain testified the defendant took the $50 from Spates for the TV.

McCain testified the other TV was put in the first bedroom to the left off the living room. She testified Jerrie and the defendant were living together, and that was their bedroom.

McCain testified she had known the defendant for about six months. She admitted her testimony was being given in exchange for the State's agreement to a reduction of her residential burglary charge to felony theft, dismissal of three misdemeanor charges, and a five-month sentence in the Kane County Corrections Center.

On cross-examination, McCain admitted she formerly used narcotics known as "T's and blues," and had used a needle and syringe to inject narcotics. She said the defendant also found a VISA card inside the blue checkbook, and she told the police she thought the checkbook and VISA card were in the defendant's dresser drawer in the bedroom. She testified the three misdemeanor charges which were to be dismissed in exchange for her testimony against the defendant were for Class A misdemeanors: driving under the influence, driving with license suspended, and retail theft. She acknowledged that she pleaded not guilty when she was arraigned on the residential burglary charge, but stated that she was going to plead guilty to the reduced charge of felony theft.

Tompy Spates testified for the State that he had known the defendant for five or six years and the defendant flagged him down as he was driving his truck and said that someone needed money and had a TV they wanted to sell. Spates said he was not interested, but the defendant got into Spates' truck and said he should look at the TV at least, because it was a pretty good one. They drove to a house on Hickory Street, and went inside where there was a white girl and a black man. The black man went into a room by the washroom, brought out a TV, and plugged it in. The black man said he would give Spates the $50 back in a couple of days, and that Spates could just hold the TV as collateral.

Spates agreed, and took the TV, which was a color portable, to his own house, where it was later recovered by the police.

On cross-examination, Spates said he really did not give the $50 to anyone, just laid it on the table by the black man.

The defendant called Officer Lamkin to testify. He stated that McCain said when she left her friend's house, she initially did not see anyone down the street, but then she saw Tommy Douglas (a/k/a Darryl Daniels) standing farther down on Prospect Street. After his recollection was refreshed with his initial written report of the incident, Officer Lamkin said McCain told him she saw "them" farther down on Prospect, meaning the defendant and Tommy Douglas.

On cross-examination, Lamkin stated that during the subsequent taped interview with McCain, he asked her: "Did you then go down to where they were at?" and she answered: "I went down where Tommy was and I asked him where Thomas was and he said that he went in the backyard of the white house."

The defendant appeals his convictions, contending he was not proved guilty beyond a reasonable doubt due to the weakness of the testimony of Lujuana McCain, the defendant's accomplice; that prejudicial questioning and argument by the prosecutor denied him a fair trial; that the court erred in allowing inadmissible and highly prejudicial hearsay testimony concerning the anonymous phone caller and the confidential phone caller; and that his sentences are excessive in that they are so grossly disparate from the negotiated sentence of Lujuana McCain.

### Reasonable doubt

The defendant contends he was not proved guilty beyond a reasonable doubt because the only witness who identified him as the offender was an accomplice who negotiated a very favorable disposition of the charges lodged against her in return for testimony against him.

The record does not validate the defendant's contention.

The court in *People v. Wilson* (1977), 66 Ill. 2d 346, 349, pointed out that Illinois has followed "the rule that uncorroborated accomplice testimony is a sufficient ground on which the trier may base a conviction," citing as examples *People v. Hermens* (1955), 5 Ill. 2d 277, *People v. Williams* (1960), 19 Ill. 2d 171, and *People v. Pittman* (1973), 55 Ill. 2d 39. (See also, *e.g., People v. White* (1984), 122 Ill. App. 3d 24, 34.) However, the rule is not rote.

The testimony of an accomplice must be regarded skeptically since it frequently is propelled by self-interest fueled by prosecutorial discretion. When a witness, such as an accomplice, has hopes of reward from the prosecution, the testimony of that witness should not be accepted unless it carries with it an absolute conviction of its truth (*People v. Newell* (1984), 103 Ill. 2d 465, 470; *People v. Williams* (1976), 65 Ill. 2d 258, 267), and it must be cautiously scrutinized on

appeal. *People v. Baynes* (1981), 88 Ill. 2d 225.

■ The fact that an accomplice witness has received or expects to receive a reward or some measure of consideration in exchange for testimony against the defendant does not of itself render it insufficient to prove the defendant's guilt (*People v. Sangster* (1981), 95 Ill. App. 3d 357; *People v. Musgray* (1976), 37 Ill. App. 3d 48); rather, whether accomplice testimony, corroborated or uncorroborated, is a satisfactory basis for conviction goes to the weight of the evidence and is, therefore, in the province of the jury or the court. (*People v. Farnsley* (1973), 53 Ill. 2d 537.) A reviewing court may not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses, but will reverse only if the evidence is so improbable, impossible, or unsatisfactory as to raise a reasonable doubt of the defendant's guilt (*People v. Winfield* (1983), 113 Ill. App. 3d 818; *People v. Pittman* (1982), 93 Ill. 2d 169), or reversal is necessary to prevent an apparent injustice. *People v. Musgray* (1976), 37 Ill. App. 3d, 48, 50.

The defendant contends here that Lujuana McCain's testimony was the only evidence that he was the perpetrator of the offenses, and that her testimony as to that fact was uncorroborated. Because she was an accomplice and her testimony was extraordinarily tainted by virtue of the extreme leniency afforded her by the State, defendant argues the case rests on evidence insufficient to prove him guilty beyond a reasonable doubt. He relies heavily for support on the recent decision of *People v. Ash* (1984), 102 Ill. 2d 485, 493.

In *Ash*, the Illinois Supreme Court affirmed the appellate court's reversal of the defendant Ash's conviction for insufficient proof. The court found the testimony against the defendant by Phelps, an accomplice, did not carry with it an "absolute conviction of its truth." In so deciding, the court focused on the fact Phelps was seeking a lenient sentence, dismissal of some charges, and had admitted on cross-examination that he would "do just about anything" to avoid imprisonment with three individuals against whom he had testified in 1976 and who allegedly had put out a contract on his life. Phelps also freely acknowledged that he would lie in order to save his life. In addition, the court in *Ash* focused on the evidence which supposedly was corroborative of Phelp's testimony, noting that although it described certain events surrounding the crime and, thus, corroborated *what* had happened, it did not serve to corroborate *who* had committed the crime.

The *Ash* court additionally rejected the State's argument there that the identification testimony of one of the victims was sufficient to support the defendant's conviction. The court found her identifica-

tion of the defendant was vague and doubtful in view of the glaring discrepancies between her verbal description of the offender and the defendant's actual physique; the unexplained lapse of time before either of the victims viewed any of the defendants who were in custody; the fact the victim twice identified attorneys seated in the courtroom spectator section as being the offender; and the fact she did not identify the defendant until she was prompted by the prosecutor.

The State distinguishes *Ash* on the basis there was sufficient evidence here which was corroborative of McCain's testimony: specifically, the discovery in the defendant's residence of the victim's VISA card and one of the two television sets, and the defendant's fingerprints on the victim's sunglasses. The discovery of these items of contraband in the defendant's possession presents a distinguishing feature.

■ Another significant distinguishing factor here is the fact the defendant first denied any involvement in the incident, but later admitted he had *"returned to the area where this incident had occurred and he had picked up the purse there[,] looking through it."* (Emphasis added.) Defendant's initial denial of involvement and his subsequent admission regarding the area of the incident evidences a consciousness of guilt, and allows the logical inference that he previously had been present at the area of the incident. It is well settled that the State may use circumstantial evidence and inferences drawn from such evidence to sustain a burglary conviction. *People v. Dace* (1983), 114 Ill. App. 3d 908, 912, *aff'd* (1984), 104 Ill. 2d 96.

■ The *Dace* case in fact presents a strikingly similar set of facts to the case at bar. In *Dace*, only the testimony of an admitted accomplice placed the defendant at the scene of a residential burglary, engaged in a breaking and entering. Against the defendant's reasonable-doubt contention on appeal that the accomplice's testimony was tainted, weak and suspicious, and even assuming the accomplice had received a promise of leniency in exchange for her testimony, the *Dace* court found her testimony at least partially substantiated by circumstantial evidence in the form of the testimony of other witnesses which placed the defendant in possession of some of the stolen items and engaged in attempting to sell them. Accordingly, the court found the evidence there sufficient to sustain the defendant's conviction. In the case at bar, Lujuana McCain and another witness, Tompy Spates, both testified at trial to the defendant's participation in the subsequent sale of the color TV taken from the Waite residence, and McCain accurately described the location where the black and white TV could be found; *i.e.*, the bedroom which the defendant shared with

Jerrie Bullard.

Accountability was one of the State's theories at trial, and the jury was instructed accordingly. Citing *People v. Grice* (1980), 87 Ill. App. 3d 718, *cert. denied* (1981), 450 U.S. 1003, 68 L. Ed. 2d 207, 101 S. Ct. 1714, the court in *People v. Byas* (1982), 104 Ill. App. 3d 562, 569, noted:

" 'Although it is true that legal accountability for a crime is based on the defendant's assistance before or during the commission of the criminal act, the defendant's conduct subsequent to the offense may raise an inference of prior or concurrent participation. [Citations.]' "

The *Byas* court also found no basis for overturning the jury's credibility determination there where the testimony of the accomplice, even when viewed with the scrutiny accorded such testimony, was greatly corroborated by the defendants' own statements, the jury was aware of the extent of the accomplice's involvement in the occurrences at issue, and the jury was given an instruction on accomplice testimony. (104 Ill. App. 3d 562, 570-71.) An accomplice instruction was given here as well.

For these reasons, we conclude the record provides no basis for reversal of the jury's determination that the defendant was guilty beyond a reasonable doubt of both offenses.

### PROSECUTOR'S PREJUDICIAL QUESTIONING AND ARGUMENT

The defendant contends he was denied a fair trial by reason of the prosecutor's questioning regarding the taking of rape-kit evidence when Mrs. Waite was examined in the hospital. As shown in the facts, the first time the rape-kit reference was made, defendant's motion for a mistrial was denied. Counsel's alternate request that the court at least instruct the jury that the examination for sexual assault is irrelevant and immaterial to the cause was not acted upon. Assistant State's Attorney John A. Barsanti stated in chambers that "[i]t's going to come out she wasn't [sexually assaulted]." Consequently, it was the court's opinion that no prejudice could inure to the defendant simply by reference to the fact the rape-kit evidence was taken.

The second time reference was made to the rape-kit evidence was during direct examination of the emergency room nurse, Karen Gartner. Defendant did not object at that time, perhaps in light of the court's earlier ruling. The prosecutor's direct examination did not include, however, a question about the test results. Therefore, defense counsel asked Gartner during his cross-examination of her whether

there was any evidence Mrs. Waite was raped. Gartner responded, "No, there wasn't."

■ In our opinion, the only conclusion to be drawn from this set of facts is that Assistant State's Attorney Barsanti intended to create the impression in the jury's mind that the defendant engaged in some kind of sexual misconduct with the 75-year-old victim of this offense. Although such intentionally egregious behavior on the part of the prosecutor could perhaps not have been inferred from the first reference, his subsequent calculatedly loose-ended questioning of Nurse Gartner, which purposefully thrust the burden of tying up those loose ends upon the defendant, leaves no doubt that the prosecutor knew exactly what he was doing.

Although the defendant did not specify this issue in his post-trial motion, nonetheless, the error was plain, and merits this court's consideration. 87 Ill. 2d R. 615(a).

Prosecutorial conduct such as that exhibited in this instance cannot but draw this court's strongest reproach and most urgent ban. The State's argument the jury could "just as easily have inferred that the giving of such a test was a routine procedure whenever a woman was victimized by a criminal assault" is an insult to humanity itself, for it presumes all criminal victimization of women necessarily includes sexual assault, and that all criminals are men.

The question of whether a new trial is warranted is determined not only with regard to the impropriety of the prosecutor's conduct, but with regard to the quantum of proper evidence otherwise used against the defendant. The prejudice improperly caused the defendant must be placed on balance with the State's legitimate case against him. When the evidence against him outweighs the prejudice caused, the error must be considered harmless.

■ It is clear here that the jury was ultimately informed there was no evidence of rape. Yet, that fact may not have totally erased from the jury's mind the inference the defendant took sexual advantage of the victim in another manner. We point out there is not a shred of evidence in the record which suggests there was an objective basis for the decision to have the victim examined for rape. There were no signs of a struggle or of a forced entry at the Waite apartment, nor any hint the victim was in a state of dishabille. The jury could well have surmised there must have been *something* which prompted the decision to check for evidence of rape. It is superficial to conclude rape-kit evidence was gathered simply because Mrs. Waite could not remember what happened. Mrs. Waite was described by several persons as being alert, not in shock, and well-oriented. Certainly

Mrs. Waite's innate sense of her physical condition would have registered something out of the ordinary had she been violated, or there would have been some discernible evidence of that fact. It is inconceivable that a rapist would take the time to re-dress his victim.

The defendant supports his argument that a new trial is warranted with citation to *People v. Nuccio* (1969), 43 Ill. 2d 375, and *People v. Shipp* (1977), 52 Ill. App. 3d 470. Those cases concerned unsupported insinuations against defense witnesses raised by the prosecution during cross-examination, and the subsequent failure to present supporting rebuttal evidence upon the witnesses' denial of the matter insinuated. The evidence complained of here was also objectionable on, and was objected to below on, the basis of irrelevancy and immateriality, and it also suggests the defendant's commission of another crime with which he was not charged. However, as the State points out, *Nuccio* involved an extended pattern of unsupported prosecutorial insinuation throughout the course of the trial, thus distinguishing it from the instant case. Further, the *Shipp* case presents no precedent for reversal, as this court in *Shipp* actually found it was unnecessary to consider the defendant's assertion as to the issue. Consequently, because the court's opinion did not proceed to find the prejudice warranted reversal, it may not be construed as support for the defendant's argument here.

In our opinion, the fact the jury eventually was advised there was no evidence of rape "cured" the error. Furthermore, in light of the fact that the defendant's convictions were sustained by the evidence beyond a reasonable doubt, the defendant was not denied a fair trial as a result of this improper evidence, and no reversal is warranted. See *People v. Robinson* (1984), 122 Ill. App. 3d 362, 367.

■ The defendant next contends the prosecutor's closing argument was so improper and prejudicial as to have denied him a fair trial.

The general rule is that a defendant's right to a fair trial requires that his conviction will be reversed if the prosecutor's improper comments constituted a material factor in the conviction or resulted in substantial prejudice to the defendant. *People v. Witted* (1979), 79 Ill. App. 3d 156, 165.

Specifically, the defendant first contends the prosecutor misstated the reasonable-doubt standard by telling the jury that the only way to reach a not guilty verdict was to create "a great loophole." The clear thrust of the prosecutor's "loophole" argument, taken in context, was that the jury should not acquit the defendant simply because the victim herself was unable to identify him. To acquit on that basis would

indeed create a "loophole," since the lack of a crime victim's positive identification of his or her attacker does not *ipso facto* mean no conviction is possible. It is well established that a conviction may be sustained on the basis of circumstantial, as well as direct, evidence.

In determining whether a prosecuting attorney's argument to a jury is prejudicial, reference must be made to the context of the language, its relation to the evidence, and the effect of the argument on the rights of the accused to a fair and impartial trial. (*People v. Smith* (1972), 6 Ill. App. 3d 259, 263.) When viewed in context, the prosecutor's argument here was neither a diminishment of the reasonable-doubt standard as that practice was condemned, *inter alia*, in *People v. Starks* (1983), 116 Ill. App. 3d 384, 394-95, nor a misstatement of the law as in, *e.g., People v. Eckhardt* (1984), 124 Ill. App. 3d 1041.

■ The defendant's next contention is that the prosecutor's reference, in essence, to the fact that even better than knocking out victims so they cannot testify to the identity of their attackers, defendants could "make it so they never come back," was inflammatory and designed to appeal to the fears of the jury.

It has been stated that:

> "It is improper for the prosecutor to do or say anything in argument the only effect of which will be to inflame the passion or arouse the prejudices of the jury against the defendant without throwing any light upon the question for decision. *People v. Payne* 359 Ill. 246; *People v. Bimbo* 314 Ill. 449." *People v. Galloway* (1956), 7 Ill. 2d 527, 533.

The defendant cites *People v. Frazier* (1982), 107 Ill. App. 3d 1096, as a more recent example of remarks made which were designed to inflame the fears of the jury, to wit, " 'People sitting next to each other on buses—If you have sisters, wives, daughters, you know they will at some point in their life—They are going to be sitting next to somebody and you don't want them raped by that person.' " (107 Ill. App. 3d 1096, 1101-02.) As defendant notes, the *Frazier* court had already determined that defendant was entitled to a new trial and, therefore, as in *People v. Crossno* (1981), 93 Ill. App. 3d 808, 824, the court did not find that the comment, in itself, amounted to reversible error, but was to be avoided upon retrial.

The State argues, citing in support *People v. Jackson* (1981), 84 Ill. 2d 350, that the type of argument which was made here by the prosecutor has been upheld as a legitimate comment on the benefits of a fearless administration of the law. A reading of *Jackson* fails to reveal any reference in that case to the type of argument which is complained of here.

Presumably the comments found improper in *Frazier* were not made in the context of any legitimate argument. Further, the comments in *Frazier* inferentially were focused on the very personal status of each juror as either a brother, husband, or father. The comment made here, however, falls reasonably within the context of the prosecutor's argument that circumstantial evidence could properly be considered and relied upon by the jury in determining the defendant's guilt, and that it would do a (hypothetical) defendant no good to "make it so that [witnesses] would never come back" because:

> "[L]ook at the resources we have. The police. The laboratories. The people we have to come in here and put this testimony on. We'll use all those resources to prove you guilty, no matter what, if you did it.
>
> Don't bother to hit him. Don't bother to do anything worse because if there's [*sic*] ways to prove it, we're going to prove it and we don't allow that to happen around here."

Rather than fanning the flame of the jury's fears, the prosecutor's comments arguably sound a reassuring note that the State would proceed, undaunted, to prosecute criminals with all the resources available to it, and will succeed in convicting them despite their attempts to conceal or negative evidence which might be used against them. In that respect, the State's argument here that the prosecutor's comments may be viewed as a comment on the "fearless administration of justice" is well taken. As such, we find no impropriety in the prosecutor's comments.

Lastly, the defendant argues the prosecutor argued facts which were not supported by the record. Defendant correctly notes the prosecutor may not make arguments or assumptions which are not based upon the evidence, and it is highly improper for the prosecutor to misstate the evidence in his or her argument. (*People v. Beier* (1963), 29 Ill. 2d 511; see also *People v. Heidorn* (1983), 114 Ill. App. 3d 933.) This is particularly true when such misstatements occur during rebuttal argument, since defense counsel then has no opportunity to make a response. (*People v. Escobar* (1979), 77 Ill. App. 3d 169, 177.) Defendant specifically claims error due to the fact the prosecutor stated with reference to the defendant: "He negotiates the price. He keeps the TV's [*sic*]. His prints are on it," when, in fact, the print on the TV was not identified as the defendant's.

■ Preliminarily, we note the defendant did not object to this misstatement at trial, nor did he specifically raise it in his post-trial motion. As such, any error in the prosecutor's comment about the TV print was waived. (*People v. Davis* (1983), 97 Ill. 2d 1, 24-25.) Defend-

ant does not argue plain error, and none is perceived. In context, the prosecutor had just argued defendant's guilt by accountability, if not by commission, and had begun to refute the attempted implication at trial by the defendant that it was Darryl Daniels, and not the defendant, who was the one who committed the offenses. The prosecutor asked the jury rhetorically:

"Is [sic] Darrell Daniels' prints on the sunglasses? Did Darrell Daniels talk to Tompy Spates and negotiate the price for the TV? Was the TV in Darrell Daniels' bedroom? No."

A fingerprint lift from the screen of the TV found in the defendant's bedroom was taken but, as defendant notes, was not identified at trial as being the defendant's. Notwithstanding, we find the prosecutor's remark was an isolated one, and we do not believe it may be concluded that the comment caused the defendant "substantial prejudice." His fingerprint otherwise was positively identified on the victim's sunglasses, which were taken during the same incident as the TV, and the TV was found in the defendant's bedroom. The likelihood that the defendant would have touched the TV appears very high under these circumstances.

The defendant also failed to object at trial or to raise in his post-trial motion his next contention that the prosecutor argued Lujuana McCain actually saw the victim punched:

"How could she have known a woman was punched and knocked out unless it happened and she saw it and was there. She couldn't have known."

Accordingly, the defendant has also waived consideration of this issue, and he does not argue plain error.

In a related argument, defendant complains about the prosecutor's use of the term "punch" during his argument. Defendant provides no record reference showing his objection to the use of the term, and it was not raised in his post-trial motion. We see nothing particularly inflammatory about the word "punch," and the record shows Mrs. Waite herself told Doctor Susarla she was "punched." Further, McCain testified the defendant stated he "knocked out" an old lady, and Mrs. Waite's son made reference to her having been "socked."

In sum, we do not believe the prosecutor's remarks improperly influenced the result, or that the verdict would have been otherwise had the remarks not been made. (*People v. Naujokas* (1962), 25 Ill. 2d 32, 38.) Accordingly, we conclude the errors complained of with regard to the prosecutor's argument provide no basis for reversal.

HEARSAY TESTIMONY *RE* ANONYMOUS AND CONFIDENTIAL INFORMANT PHONE CALLS

 ██ Defendant contends the trial court erred in allowing police testimony as to the content of two telephone conversations, one with an anonymous caller and one with a confidential informant. Defendant argues this testimony was inadmissible hearsay and that it severely prejudiced him and requires reversal and remand for a new trial.

Defendant relies on *People v. Kneller* (1980), 83 Ill. App. 3d 325, in support of his contention. *Kneller* is distinguishable, however, because it was clear in that case that the victim's testimony about his phone call from the defendant's mother in which she said she had found the victim's stolen wallet in her son's car was offered to prove the truth of the matter asserted. The reason advanced for the officer's testimony here was that it was preliminary to showing why the officer's investigation proceeded the way in which it did; *i.e.*, the arrest and interview of Lujuana McCain which, in turn, led to the issuance of the search warrant for Jerrie Bullard's house.

When a police officer testifies that he had a conversation with an individual and that he subsequently acted thereon, *without revealing the substance of the conversation*, such testimony is based on the officer's personal knowledge and is competent to show the officer's investigatory procedure. (*People v. Griggs* (1982), 104 Ill. App. 3d 527; *People v. Daliege* (1976), 40 Ill. App. 3d 706.) When the testimony proceeds beyond the facts based on the officer's personal knowledge, it becomes inadmissible hearsay. (*People v. Griggs* (1982), 104 Ill. App. 3d 527, 531; *People v. Dunning* (1980), 88 Ill. App. 3d 706, 709.) Therefore, it was error for the court to admit Officer Landwehr's testimony as to the substance of his conversation with the anonymous phone caller in which he or she named the defendant as one of the three "perpetrators" of the crime.

 In contrast, however, Officer Lamkin's testimony concerning the content of his conversation with a confidential informant, although naming the defendant, did not place him at the scene of the crime. The informant stated only that he had seen the defendant with Lujuana McCain and another black man the night before. The information about two black males and one white female being near the vacant lot next to the Waite residence did not emanate from either the anonymous caller or the confidential informant. Rather, the record shows it came from someone else who told the initial investigating officers that a white female and two black males had been seen in the adjacent lot during that night. Defendant also objected to that testi-

mony as hearsay; however, he does not assert here that admission of that testimony was error. Since the testimony regarding the informant's statement did not place the defendant at the scene of the incident, and because the testimony concerning two black males did not amount to an identification of the defendant, its only value appears to have been in further explaining the officer's subsequent investigatory conduct, and it was not hearsay. *Cf. People v. Jones* (1983), 114 Ill. App. 3d 576, 589-90 (where the court found testimony of the arresting officer that, during pursuit of the fleeing suspect, an unidentified woman told him she saw a man running south on Albany, and where the defendant was arrested immediately thereafter on Albany, one-half block south of the site of the conversation, was not hearsay because the woman's statement did not identify the defendant as the person observed, nor did it link the person observed to the crime).

As noted, it was error to admit the substance of the anonymous phone caller's conversation. Reversal is not automatically warranted, however. The admission of hearsay evidence is harmless error where there is no reasonable probability that the jury would have acquitted the defendant if the hearsay evidence had been excluded. (*People v. Griggs* (1982), 104 Ill. App. 3d 527; *People v. Hall* (1980), 90 Ill. App. 3d 1073.) We find no reasonable probability in this case that the jury would have acquitted the defendant even absent this improper evidence, particularly where the jury was instructed on the theory of accountability, and where the defendant himself admitted he "returned to the area of the incident" and looked through Mrs. Waite's purse.

### EXCESSIVE SENTENCE

 Defendant contends his sentence is so grossly disparate from the negotiated sentence of his accomplice, Lujuana McCain, as to be excessive.

Defendant's contention is without merit. In addition to the fact he was convicted of two offenses as opposed to McCain's one, and to the fact his prior criminal history is—by comparison to the incomplete revelation in the record of McCain's—extensive, and included convictions for such other violent crimes as attempted murder, armed robbery, and burglary, it has been firmly established that the sentence of a codefendant or accomplice pursuant to entry of a plea in return for his or her testimony, provides no valid basis for comparison. (*People v. White* (1984), 122 Ill. App. 3d 24, 38-39; *People v. Bennett* (1980), 90 Ill. App. 3d 64.) *People v. Bares* (1981), 97 Ill. App. 3d 728, cited by the defendant in support of his argument, is clearly distinguishable on its facts, particularly the fact the codefendant there was sentenced af-

ter trial and not pursuant to a plea agreement.

■■■ However, the defendant was sentenced to two extended-term sentences, and both the State and the defense now agree this was error in light of the recent supreme court decision in *People v. Jordan* (1984), 103 Ill. 2d 192.

In that case the court construed section 5—8—2(a) of the Unified Code of Corrections, which provides:

> "A judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by Section 5—8—1 *for the class of the most serious offense of which the offender was convicted* unless the factors in aggravation set forth in paragraph (b) of Section 5—5—3.2 were found to be present." (Emphasis added.) Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—2(a).

The supreme court determined that its decision in *People v. Evans* (1981), 87 Ill. 2d 77, was dispositive of the issue. It pointed out that the legislature has not amended the statute since *Evans*, and that if the clause "for the class of the most serious offense of which the offender was convicted" was omitted from the statute, then an extended term could properly be imposed for a lesser offense of which an accused was convicted. However, the legislature did include the clause, which indicates an intendment to limit the imposition of the extended term to only those offenses within the most serious class. (*People v. Jordan* (1984), 103 Ill. 2d 192, 205-06.) When a defendant has been convicted of multiple offenses of differing classes, an extended-term sentence may only be imposed for the conviction within the most serious class upon proof of that offense and one of the factors in aggravation. Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—3.2

In the case at hand, the defendant had previously, within 10 years, been convicted of attempted murder and armed robbery, both Class X offenses, and the trial court noted the victim suffered a broken jaw, also an aggravating factor. The defendant having been convicted of home invasion, a Class X felony, and residential burglary, a Class 1 felony, could only be sentenced to an extended term for the most serious class of offense for which he was convicted. In this case, it is the Class X offense of home invasion. Accordingly, we vacate the 30-year extended-term sentence for the offense of residential burglary. Since it is apparent the trial judge intended to impose the maximum penalty for the offense of residential burglary, we modify the defendant's sentence for that offense to the maximum nonextended term, which is 15 years. We affirm the defendant's sentence for home invasion of 40 years.

*PRO SE* ISSUES

 Defendant's motions to file a *pro se* brief and an amended *pro se* brief were denied by this court on January 16, 1985, and February 6, 1985. On March 29, 1985, in an exercise of its supervisory jurisdiction, the Illinois Supreme Court ordered that the *pro se* brief be filed. (Docket No. 7335.) The issues raised therein are addressed below.

Defendant first contends his warrantless arrest upon the confidential informant's tip "failed the two-pronged test of *Aguilar v. Texas*," was therefore without probable cause and should have been quashed.

Notwithstanding the fact the rigid "two-pronged test" of *Aguilar* and *Spinelli* has been abandoned and a "totality of the circumstances" approach substituted in its place (*Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317; *People v. Winters* (1983), 97 Ill. 2d 151, 161), defendant's argument presents a new theory on appeal that was neither presented nor argued below.

The thrust of defendant's argument at the motion to quash was not that probable cause was lacking because of the confidential informant's tip but that the arresting officer had no reasonable grounds to believe there was an outstanding warrant for defendant's arrest, and had no reasonable grounds to believe that the defendant was committing or had committed an offense at the time of his detention.

After an evidentiary hearing the court determined there was probable cause for the warrantless arrest of the defendant. The evidence at the hearing showed the defendant, along with Lujuana McCain, was a passenger in a car driven by Darryl Daniels in Schaumburg. Daniels was stopped for making an improper lane change, was arrested for not having a license, and the car was impounded. The defendant and McCain were released and proceeded on their way on foot.

Prior to the initial stop, the Schaumburg police officer testified both the front and rear seat passengers, defendant and McCain, respectively, ducked down when their car passed the squad car. After the traffic stop was made, the officer was going to release the car to one or both of the passengers, but the Secretary of State's office had no record at all of McCain, and the defendant had a suspended driver's license. As the officer approached the stopped car in order to effect the arrest of Daniels, Daniels was observed passing an open knife to the defendant, who attempted unsuccessfully to conceal it inside his pant leg. Defendant complied with a police order to drop the knife. Defendant and McCain were then released, and Daniels taken into custody. After returning to the station, the officer called the Elgin po-

lice department to get a better check on the driver and the passengers. He was advised there was an "on-going" investigation concerning all three. It was discovered that the name given to the Schaumburg police by McCain was one of her aliases. A check of the several names used by McCain showed a warrant for her arrest outstanding in Kane County. The officer was also advised by Elgin that the defendant was to be considered dangerous and was to be approached with caution; that "there was a homicide investigation, and trial that went on with the shooting that occurred."

Schaumburg police relayed the information it had about McCain and the defendant to the Elk Grove and Hoffman Estates police, along with their descriptions and the fact there was "prior violent activity from the [defendant]." The departments were advised that defendant and McCain had "no personal belongings or any type of proceeds with them" at the time they were released from the traffic stop. When McCain and the defendant were spotted a short time later in Hoffman Estates by Officer Schwarz, they were in possession of a portable stereo and a satchel. The two were confronted by Hoffman Estates police, detained at the site until a Schaumburg police squad arrived, and while en route to the Schaumburg police department it was learned that a custodial search of the satchel led to the discovery that it and the stereo were from an apartment in Hoffman Estates that had just been burglarized and ransacked. Defendant and McCain were then held at the Schaumburg police department while awaiting the arrival of Hoffman Estates police and the Elgin police.

As indicated above, the two-pronged test of *Aguilar* and *Spinelli* no longer applies. As noted in *Gates*:

"[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules. Informants' tips doubtless come in many shapes and sizes from many different types of persons. As we said in *Adams v. Williams*, 407 U.S. 143, 147[, 32 L. Ed. 2d 612, 92 S. Ct. 1921] (1972): 'Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability.' Rigid legal rules are ill-suited to an area of such diversity. 'One simple rule will not cover every situation.' *Ibid.*" *Illinois v. Gates* (1983), 462 U.S. 213, 232, 76 L. Ed. 2d 527, 544, 103 S. Ct. 2317, 2328-29.

The *Gates* court observed that the informant's veracity or reliability and his basis for knowledge would better be understood if viewed simply as relevant considerations in the totality of the circumstances,

and that a deficiency in one may be compensated for by a strong showing as to the other, or by some other indicia of reliability. *Illinois v. Gates* (1983), 462 U.S. 213, 233, 76 L. Ed. 2d 527, 545, 103 S. Ct. 2317, 2329.

Defendant's contention that the Elgin officers investigating the offense at bar "had the defendant and Ms. McCain arrested" in Schaumburg pursuant to the informant's tip is a misstatement of the facts. The informant's tip was only one of several factors in the totality of the circumstances as shown by the evidence adduced at the hearing to quash. Undoubtedly attributable to the fact the defendant did not raise this aspect of the issue of probable cause below, the record contains no testimony regarding either the informant's reliability or basis of knowledge. The entirety of the record, however, shows there was probable cause for the defendant's arrest. In determining the propriety of the ruling at bar, the reviewing court may also consider evidence which is adduced at trial. (*People v. Turner* (1984), 122 Ill. App. 3d 81; *People v. Flowers* (1982), 111 Ill. App. 3d 348; *People v. Reyes* (1981), 102 Ill. App. 3d 820.) When Elgin police officers advised Schaumburg that the defendant was "under investigation" they had received information from a resident of the neighborhood that she had seen a white woman and two black men near the vacant lot next to the victim's apartment. The police subsequently received a tip from an anonymous caller who "[s]tated that a subject known to her as Tompy Douglas which she really didn't believe was his real name and a white female by the name of Lujuana McCain and another Thomas White were the perpetrators of the crime." They also had information from a confidential informant that he had seen the defendant with Lujuana McCain and another black man the night before. In addition to these facts, Schaumburg police observed defendant and McCain "duck down" in Daniels' car when it passed the squad car, and later observed the defendant attempt to conceal an open knife passed to him by Daniels. Despite the fact that deliberately furtive actions at the approach of police officers have been properly considered strong factors in the decision to make an arrest (*People v. Stamps* (1982), 108 Ill. App. 3d 280), the Schaumburg police released McCain and the defendant. Subsequently, upon receipt of further information from Elgin and a warrant check, Schaumburg gave a description of the pair to Hoffman Estates and Elk Grove police officers, advised them that there was a warrant outstanding for McCain, that she and the defendant were wanted for investigation in Elgin, and that the defendant should be considered dangerous and approached with caution. Shortly after that communication, Hoffman Estates police observed the pair

near some apartments in possession of a portable stereo and a satchel. By radio, it was ascertained that upon their release in Schaumburg the defendant and McCain had no possessions with them. It has been established that a police officer may effect an arrest on the basis of information received through police communications channels, including radio messages, without the necessity of an outstanding warrant or preexisting probable cause in the mind of the arresting officer. (*People v. Thibudeaux* (1981), 98 Ill. App. 3d 1105.) At the very least, Hoffman Estates police officers were warranted in conducting a temporary questioning of the defendant as provided in section 107—14 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 107—14). Further, the removal of the defendant and McCain to the Schaumburg police department is not considered *per se* more intrusive than detaining him on the spot. (*People v. Vena* (1984), 122 Ill. App. 3d 154, 163.) In fact, such removal was wise in this case, since the encounter with the defendant took place at a convenience food store, and the police had been warned to approach him with caution since he was potentially dangerous. Thereafter, while en route to Schaumburg, the police were advised the items that were found in the possession of McCain and the defendant had just been stolen from one of the apartments where they were first observed by the Hoffman Estates police, thus indisputably establishing probable cause for defendant's arrest. McCain later related to the police the details of the defendant's involvement in the invasion and burglary of the Waite residence in Elgin. In light of the above, it appears the defendant was first properly detained and then arrested in connection with the Hoffman Estates offense—based, in part, on the information received from Elgin and Schaumburg—and was later properly arrested on the Elgin charges by virtue of the information received from McCain. *Cf. People v. Hawkins* (1974), 23 Ill. App. 3d 758, 760 (where, in prosecution for armed robbery, it was shown that police officers were investigating a prior, unrelated robbery and had been informed the previous day that an accusation had been made against defendant, and where they coincidentally arrested the defendant just after the armed robbery which was the subject of the prosecution, there was probable cause for defendant's warrantless arrest, and defendant's detention for the armed robbery charge was proper).

Accordingly, we find the court's judgment denying the defendant's motion to quash was not manifestly erroneous and should not be disturbed. *People v. Ellis* (1985), 131 Ill. App. 3d 639; *People v. Calderon* (1980), 85 Ill. App. 3d 1030.

▮ Defendant next contends the court's judgments denying his

motions to suppress evidence as being the product of his illegal arrest without probable cause and to suppress evidence obtained as the result of an invalid search warrant and a search beyond the scope of the warrant were against the manifest weight of the evidence.

The record of the hearing shows the trial court denied the first of the motions to suppress which was based on the allegedly illegal arrest in light of its judgment that the defendant's arrest was not illegal. Further, the record shows no evidence was received as to the scope of the execution of the warrant. Defense counsel stated that, as of the time of the hearing, it did not appear that the search exceeded the scope of the warrant, but that a request to renew the motion would be made if at a later date it should appear that the officers overstepped their bounds. In further discussion, counsel stated he did not know at that point where in the house the items which were seized were found. The State suggested the trial court could determine the validity of the warrant on its face. The court then denied both motions to suppress.

■■■ Our review of the search warrant as contained in the record shows no deficiency on the face of the warrant, nor in the complaining officer's affidavit. The affidavit was based on the information given by Lujuana McCain about the defendant's actions on the night in question. Generally, any challenge to the issuance of a search warrant is limited to questions concerning the sufficiency of the affidavit and the accused is not allowed to go beyond the "four corners" of the affidavit to show the lack of probable cause. (*People v. Brumfield* (1981), 100 Ill. App. 3d 382.) In order to warrant an evidentiary hearing:

> "[T]he challenger's attack [on the warrant] must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Franks v. Delaware* (1978), 438 U.S. 154, 171, 57 L. Ed. 2d 667, 682, 98 S. Ct. 2674, 2684.

■■■ Defendant's challenge to the warrant here is conclusional and does not attack the truth of the affiant's allegations. Consequently, there was nothing before the trial court which would require an evidentiary hearing be held, and no reversal of the trial court's judgment is warranted.

■■■ During trial, testimony concerning the execution of the search warrant and the items seized which was given by several witnesses was admitted without objection from the defendant. At the

conclusion of Detective Gonzales' testimony, defense counsel moved "to reiterate the Motion [to suppress] from a different standpoint"; that is, that the search exceeded the scope of the warrant because the police went into a suitcase under the bed. The State objected to the motion on the basis it was untimely, since the grounds for defense counsel's motion had been known to him as soon as the State filed its answer to discovery in July 1983. The State's amended answer to discovery and list of tendered documents were filed on November 9; trial began November 14. The State also argued the search of the suitcase for evidence of occupancy and possession of the premises was reasonable. The court denied the defendant's motion on the basis of untimeliness and on the basis the search was not beyond the scope of the warrant.

Defendant argues the warrant was so nonspecific as to fall within the proscription against general search warrants (*People v. Thiele* (1983), 114 Ill. App. 3d 189), and that the search of the suitcase was unconstitutional as a violation of his expectation of privacy, citing, *inter alia, People v. Richards* (1983), 94 Ill. 2d 92.

Section 114—12(c) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 114—12(c)) allows the court discretion to determine whether a motion to suppress made during trial is untimely. In light of the fact the grounds for the defendant's motion were known to him prior to trial, there appears to have been no justification for making the motion during trial rather than before trial. (*People v. Foster* (1977), 56 Ill. App. 3d 22, 36-37, *rev'd on other grounds* (1979), 76 Ill. 2d 365, 382; *People v. Johnson* (1967), 38 Ill. 2d 399, 402-03.) Consequently, no abuse of the trial court's discretion is evident and no reversal is warranted.

■■■ In addition, we agree the search was not beyond the scope of the warrant, and find the warrant was not so indescriptive of the items sought as to render it a general warrant. The fourth amendment requirement that there must be a particular description of the things to be seized is meant to prevent the problem of a general, exploratory rummaging in a person's belongings. (*Andresen v. Maryland* (1976), 427 U.S. 463, 480, 49 L. Ed. 2d 627, 642, 96 S. Ct. 2737, 2748.) It has been found, however, that a search warrant issued for items of proof of residency in conjunction with search for other named contraband is sufficiently narrow for constitutional purposes and does not amount to authorization for a general search of personal papers. (*United States v. Reed* (7th Cir. 1984), 726 F.2d 339, 342.) Further, the search of a closed container in the course of the execution of a search warrant has been found to be justified where, under

all the circumstances, it was reasonable to believe the items sought would fit therein and might be found therein. *United States v. Pritchard* (7th Cir. 1984), 745 F.2d 1112, 1122.

 Defendant next contends he was denied a fair trial due to the reference made during Detective Landwehr's testimony about having used "another" fingerprint card for comparison purposes rather than the one taken when the defendant was arrested. Defense counsel moved for a mistrial, arguing that the reference to the other fingerprint card carried the implication that the defendant had a previous arrest. The trial court denied the motion. In chambers, just prior to the testimony of Detective Landwehr which is complained of here, defense counsel stated he did not want the mention made of his client's fingerprints "to be from a former arrest." The prosecutor stated he had cautioned all the officers about that, and counsel stated he wanted it "made clear *** that the prints of my client are from the time he was arrested for this offense." The prosecutor stated he thought it was clear, but that "maybe it isn't." Before the in-chambers discussion, the prosecutor had asked Detective Landwehr on direct examination "and you had fingerprints at this time of Mr. White?" To which the detective responded simply yes. Apparently, defense counsel was seeking a clarification of that response.

Back in open court, when the prosecutor attempted to clarify as requested, the apparently unexpected response from Detective Landwehr was that the fingerprint card taken at the time of the arrest was *not* the one used for the comparison. Defendant did not object to the detective's answer, nor ask that it be stricken, perhaps to avoid lending any further emphasis to it in front of the jury. As noted, in a sidebar at the conclusion of Detective Landwehr's testimony, counsel moved for a mistrial which the trial court denied.

Although we agree the inference of a previous arrest could possibly have been drawn, we find the officer's reference to the fact they had "another" fingerprint card is ambiguous. The officer did not state the card was from a previous arrest, nor did his response strictly imply that the other card was from a previous arrest. The inference could also be drawn that a separate fingerprint card was taken solely for comparison purposes or there was a duplicate. In determining whether error was harmless beyond a reasonable doubt, the question is whether there is a reasonable possibility that evidence complained of might have contributed to the conviction. (*People v. Ishmael* (1984), 126 Ill. App. 3d 320.) In our opinion, there is no reasonable possibility the ambiguous testimony complained of here contributed to the defendant's conviction. Further, given the circumstances as shown in

the record, it appears the error was invited by the defendant. His desire for clarification was the offspring of his improvident assumption that he knew what Detective Landwehr's response to the question would be. It is well settled that a defendant cannot complain of error which was acquiesced in or invited by him. *People v. Benka* (1983), 117 Ill. App. 3d 221, 224.

Defendant also raises the issue of the prosecutor's improper questioning concerning the rape-kit evidence. This issue was also raised by his appellate defender and has been addressed above.

▇▇▇ Defendant next contends he was denied a fair trial due to the "deleberate [*sic*] suppression of Officer Benson's Supplementary Police Report *** and the [s]uppression of Officer Rizzoe's police report," citing in support *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194, and *Moore v. Illinois* (1972), 408 U.S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562. He argues these reports were material and relevant to his "innocence or guilt or punishment," and were "exculpatory in light of other State evidence and contridicted [*sic*] the State's case."

*Brady* held that suppression by the State of evidence favorable to the accused upon request violates due process. The court in *Moore* observed that the heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Notwithstanding the fact this issue may be considered waived since it was not raised in the defendant's post-trial motion, the record clearly shows Hoffman Estates police officer Benson's report was not being suppressed by the State; rather, Officer Benson testified the department's record section lost the supplementary report he filed and it could not be found. Further, it appears any information contained in the report would have been relevant only to the issue of the probable cause underlying the defendant's arrest, and would not have been exculpatory. Similarly, the record shows the report of Schaumburg police officer Rizzoe—although not lost and apparently able to be produced—was nonetheless not material to the issue of the defendant's guilt or innocence. Officer Rizzoe was involved in the incident only to the extent that he responded to the scene of the defendant's arrest in Hoffman Estates, and then transported Lujuana McCain from Hoffman Estates to Schaumburg. Accordingly, we find no due process violation due to the lack of these reports.

▇▇▇ Defendant next contends that the "systematic exclusion of blacks from his jury violated his right to a fair trial," and that his sixth amendment guarantee of an impartial jury was violated in that

he was deprived of a jury drawn from a fair cross section of the community. In support, he cites *Taylor v. Louisiana* (1975), 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692.

The record shows that before *voir dire* was conducted, defense counsel orally moved for a mistrial on the basis there were no "black faces, no black people" in the array. The prosecutor argued that that was not grounds for a mistrial in Illinois, and the trial court denied the motion. We find no error in the court's judgment.

Objections to the manner in which a jury panel has been selected or drawn shall be raised by a motion to discharge the jury panel; the motion must be in writing supported by affidavit and shall state facts which show that the jury panel was improperly selected or drawn. (Ill. Rev. Stat. 1983, ch. 38, par. 114—3(a)(b).) Denial of such a motion on the grounds it was not in writing and accompanied by an affidavit has been upheld. (*People v. Perry* (1980), 81 Ill. App. 3d 422, *cert. denied* (1981), 451 U.S. 983, 68 L. Ed. 2d 839, 101 S. Ct. 2313; *People v. Rosa* (1982), 111 Ill. App. 3d 384.) A trial court has also been held not to have erred in refusing to allow a defendant's challenge to the array without hearing when the defendant alleged only that no Negroes had appeared on any of the four jury panels in cases tried by defense counsel. *People v. Eastland* (1972), 7 Ill. App. 3d 209.

Lastly, in his affidavit filed in support of his motion to allow his *pro se* brief, the defendant alleges his appellate defender was incompetent and ineffective in her representation of him on appeal for failing to raise the issues which he has presented here *pro se*. It has been observed, however, that appointed counsel in the appeal of a criminal case has no duty to present for review nonmeritorious matters simply because they may conceivably have some connection with the record. (*People v. Richards* (1983), 118 Ill. App. 3d 550.) "The attorney must exercise [her] best professional judgment in evaluating the issues to be offered for review. [Citations.]" 118 Ill. App. 3d 550, 553-54.

Further, it has been found that it is not incompetence for appellate counsel to fail to raise an issue on appeal which counsel believes is without merit, unless counsel's appraisal of the merits is patently erroneous. *People v. Frank* (1971), 48 Ill. 2d 500, 505; see also *People v. Barnard* (1984), 104 Ill. 2d 218; *People v. Bradley* (1984), 128 Ill. App. 3d 372; *People v. Crater* (1984), 124 Ill. App. 3d 1074.

In light of the foregoing discussion of the issues raised *pro se* by the defendant, we find appellate counsel's appraisal of the merits of those issues was not erroneous. We find defendant's further allegation that appellate counsel "has done no reading of the defendant's trial

transcripts, or legal research, or investigation" is an utterly baseless attack on appellate counsel's professional integrity and is thoroughly belied by the quality and completeness of the brief and supplemental brief filed by her on defendant's behalf.

In sum, the judgment of conviction of the defendant is affirmed. The defendant's sentence of 40 years for home invasion is affirmed. The defendant's sentence for residential burglary is vacated, and the defendant is sentenced to 15 years in the Department of Corrections for that offense, the sentences to run concurrently. The cause is remanded to the circuit court of Kane County for preparation and filing of a new *mittimus*.

Affirmed in part, vacated in part, sentence modified and cause remanded.

LINDBERG and STROUSE, JJ., concur.